570 F.2d 38
 Fed. Sec. L. Rep. P 96,275
David E. ROLF, Plaintiff-Appellant-Cross-Appellee,
v.
BLYTH, EASTMAN DILLON & CO., INC. and Michael Stott,
Defendants- Appellees-Cross-Appellants.
 Nos. 22 and 405, Dockets 77-7104 and 77-7124.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 12, 1977.
Decided Jan. 3, 1978.
 
 Sidney B. Silverman, Silverman & Harnes, New York City, for plaintiff-appellant-cross-appellee.
 Thomas W. Kelly, Breed, Abbott & Morgan, New York City (Robert G. Kuhbach, Charles Siegel, New York City, of counsel), for defendants-appellees-cross-appellants.
 Before SMITH, MANSFIELD and OAKES, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 On cross appeals from a judgment of the United States District Court for the Southern District of New York, Lawrence W. Pierce, Judge,[1] plaintiff David E. Rolf (Rolf) endorses the district court's holding on questions of liability, but challenges the district court's measure of damages. Defendants in turn attack the district court's theories of liability. In the court below, Judge Pierce imposed aiding and abetting liability on defendant Michael Stott (Stott) and derivative liability on his employer, Blyth, Eastman Dillon & Co., Inc. (BEDCO), for Stott's substantial assistance to and participation in a web of securities fraud perpetrated by defendant Akiyoshi Yamada (Yamada),[2] contrary to § 10(b) of the Securities Exchange Act of 1934 (SEA), 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10(b)-5. Judge Pierce also implied a private cause of action under New York Stock Exchange (NYSE) Rule 405 and under Article III, Section 2 of the constitution of the National Association of Securities Dealers (NASD). The Judge then awarded damages and interest totaling $55,790. We agree with Judge Pierce on the aiding and abetting liability of Stott. We therefore affirm as to him and in view of BEDCO's acknowledgment for purposes of this appeal that it is vicariously liable by reason of Section 20 of the 1934 Act, 15 U.S.C. § 78t(a), affirm also as to it. Brief for Defendants-Appellees-Cross-Appellants at 28n.*. Accordingly, we do not reach the question whether there is an implied cause of action under the NYSE rule or the NASD constitution. We disagree with Judge Pierce on the measure of damages, however, and accordingly remand for reconsideration thereof.
 
 
 2
 * Facts
 
 
 3
 Rolf is an ophthalmologist from Shaker Heights, Ohio. Long an investor and an aggressive trader in the stock market, he began his association with Eastman Dillon Union Securities & Co., BEDCO's predecessor firm, in 1963 when he entrusted a discretionary account to S. Logan Stirling, a partner of the firm. The value of Rolf's portfolio at that time was approximately $400,000. In March of 1969 Stirling was forced to retire owing to ill health. At the end of April, a BEDCO partner assigned the Rolf account to Stott, a registered representative with the firm for 11 years during 4 of which he was a manager of BEDCO branch offices. Stott then telephoned Rolf and offered his services. Rolf, however, wanted an investment advisor to manage his account, not simply a broker. Stott, therefore, at Rolf's request, supplied the names of two investment advisors. Rolf ultimately interviewed and selected Yamada, one of the "new breed" of young money-managers with supposed expertise in research and "special situations."
 
 
 4
 The district court found that Rolf's investment intent was to combine Yamada's and Stott's strengths into a "Stirling-type" operation, 424 F.Supp. 1021, 1028 (1977). By combining Yamada's youth and zeal with Stott's reliability and supervision, Rolf hoped to realize, as he had with Stirling's advice, substantial capital gain in an investment program emphasizing preservation and augmentation of capital. In furtherance of these investment objectives, Rolf executed a broad authorization giving his investment advisor, Yamada, full trading discretion. Rolf left the account and its accompanying trading commissions with Stott and BEDCO in return for Stott's supervision of Yamada.
 
 
 5
 On May 9, 1969, the date of the trading authorization, Rolf's equity in his portfolio stood at $1,423,000. The portfolio consisted of 21 good quality, listed securities and the warrants of two companies.[3] By January of 1970 Yamada had liquidated the entire portfolio, selling 14 issues at a loss. The net value of Rolf's portfolio had declined to approximately $712,000 of which $338,000 was invested in the restricted stock of Delanair, Inc.[4] During this period of portfolio liquidation. Yamada and Stott were in daily contact. The district court found that out of 41 issues purchased for Rolf in the complaint period Stott "either recommended or was somehow involved with the decision to purchase" 12 securities, some of which were highly speculative. Id. at 1030.[5]
 
 
 6
 With the rash of new, unfamiliar securities which found their way into Rolf's portfolio, Rolf became concerned and sought assurances from Stott as early as July, 1969. Specifically Rolf wished to ascertain that Yamada's purchases were consistent with the former's investment goals and strategy. To assuage Rolf's fears, the district court found, Stott undertook a hand-holding operation whereby Stott would reassure Rolf of Yamada's competence whenever Rolf questioned it. Id. at 1031. For example, when in August, 1969, Yamada decided to purchase nearly $400,000 in Delanair stock, Rolf checked with Stott who assured the doctor that if Yamada recommended the stock, then it was safe to proceed.
 
 
 7
 By March 29, 1970, the value of Rolf's portfolio had dropped to $446,000 of which nearly one-half was tied up in Delanair. In early April, Rolf complained to Stott who began to assume the posture that he was a mere "order taker." Rolf disagreed with this self-description, asking Stott to "work closely with Aki," and reminded Stott that Stott was his "man in N.Y." Id. at 1032-33. Later, on December 14, 1970, Rolf again asked Stott to "keep (his) pulse on the situation."
 
 
 8
 The district court discredited Stott's testimony that he was not involved in the management of Rolf's portfolio specifically finding that Stott was in fact so enmeshed. Id. at 1028, 1030, 1031. Stott and Yamada were in daily contact. Stott made numerous recommendations to Yamada for Rolf accounts using BEDCO research analysis, id. at 1030, but never counseled against a Yamada purchase. Id. at 1033. And most of the trades were executed through Stott at BEDCO. For those stocks purchased through other brokerage houses, because of BEDCO internal rules, Stott received confirmation slips. Additionally, such securities were delivered to and held by BEDCO.
 
 
 9
 The district court's finding on the question of Stott's attitude toward the quality of the purchases is not altogether clear. The lower court states on the one hand that it gives "some weight to Yamada's statement that Stott referred to the stocks in the Rolf account as 'junk,' " i.e., of very low quality. Id. at 1033 (emphasis added). But the Judge goes on to conclude "that Stott did indeed consider many of the securities to be 'junk' and that he told this to Yamada." Id.
 
 
 10
 The district court unequivocally found, however, that Yamada was engaged in fraudulent stock manipulations, of which Stott was ignorant. The district court also concluded unambiguously that Yamada's overall management of the account was fraudulent in nature, over and above the specific manipulations of which Stott was unaware. Id. at 1043. Stott was of course knowledgeable that many of the securities purchased for Rolf were highly speculative, "high-fliers." Id. at 1035. Nevertheless, neither Stott nor BEDCO ever identified any security as unsuitable for Rolf. Id. at 1036. Stott's services to Rolf consisted solely of certain "buy" recommendations, executing transactions and performing the accompanying paperwork. The court concluded that
 
 
 11
 Stott's practice of continually voicing his confidence in Yamada and in Yamada's investment decisions constituted a fraud upon Dr. Rolf, who sincerely believed that Stott had some basis for his statements. The statements of support and the assurances which were repeatedly made were made with willful and reckless disregard for whether they were true or false.
 
 
 12
 Id. at 1042.
 
 II
 District Court Holding
 
 13
 The district court based liability on alternative legal theories. The first was that Stott owed a fiduciary duty to Rolf which he breached; that by virtue of that breach Stott aided and abetted Yamada's fraud and was therefore liable under § 10(b) of the SEA, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10(b)-5; and that BEDCO's liability for Stott's participation in Yamada's fraud derives alternatively from the common law doctrine of respondeat superior or the securities law doctrine of controlling persons liability, § 20(a), SEA, 15 U.S.C. § 78t(a). The district court also rested liability on an implied private cause of action from violations of NYSE Rule 405 and the NASD constitution, Article III, Section 2.[6] The Judge then awarded damages of $55,790, on a "churning" theory, even though he dismissed plaintiff's churning claim, on the ground that any other measure of damages would be "speculative." 424 F.Supp. at 1045.
 
 III
 Standard of Review
 
 14
 At the outset, we note that the evidence in this case against Stott, while not overwhelming, is substantial. We are bound by the district court's findings, as we discern them, on the basis of the clearly erroneous rule. Fed.R.Civ.P. 52(a); see United States Steel and Carnegie Pension Fund, Inc. v. Orenstein, 557 F.2d 343 (2d Cir. 1977) (sub silentio). We have held on countless occasions that on review of district court findings, "we may not substitute our judgment on facts for that of the trial judge, who was in a superior position to appraise the evidence, and we may not reverse his findings unless, on the entire record, we are " ' "left with the definite and firm conviction that a mistake has been committed.' " Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123 (89 S.Ct. 1562, 23 L.Ed.2d 129) (1969), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (68 S.Ct. 525, 92 L.Ed. 746) (1948). " Van Alen v. Dominick & Dominick, Inc., 560 F.2d 547, 550 (2d Cir. 1977). This is true because the trial judge is particularly able to assess the demeanor and credibility of witnesses. Id. at 551; see Newburger, Loeb & Co. v. Gross, 563 F.2d 1057, at 1070 (2d Cir. 1977).
 
 IV
 Liability
 A. Stott
 
 15
 There is no doubt that Yamada perpetrated a gross fraud upon Rolf in violation of § 10(b) and Rule 10b-5. We conclude that Stott, by virtue of assurances of confidence in Yamada and in Yamada's investment decisions and by virtue of his reckless disregard of whether those assurances were true or false and of substantial evidence that Yamada was improperly and fraudulently managing Rolf's account, participated in and lent assistance to the fraud upon Dr. Rolf. The reasoning which leads us to this conclusion follows.
 
 
 16
 1. Reckless disregard of truth or falsity as constituting scienter. The starting point is Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In Hochfelder, the Supreme Court explicitly failed to decide whether § 10(b) and Rule 10b-5 may, in appropriate circumstances, give rise to aiding and abetting liability and, if so, the elements of such a cause of action. Id. at 192 n. 7, 96 S.Ct. 1375. Although the Supreme Court has, therefore, not passed on the issue, our court has adopted the position that § 10(b) and Rule 10b-5 do permit the imposition of aiding and abetting liability. Hirsch v. DuPont, 553 F.2d 750, 759 (2d Cir. 1977); see Brennan v. Midwestern United Life Insurance Co., 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970); Note, Accountants' Liabilities for False and Misleading Financial Statements, 67 Colum.L.Rev. 1437, 1448 (1967). Of course, the basic holding of Hochfelder, that scienter is an element of the § 10(b)/Rule 10b-5 cause of action,[7] also establishes the standard for aiding and abetting liability.[8]
 
 
 17
 The question then becomes precisely what level of scienter is required in this type of 10b-5 case and whether the district court's findings indicate that plaintiff's proof satisfies that standard. We conclude on one of the questions left open by Hochfelder, 428 U.S. at 194 n. 12, 96 S.Ct. 1375, that at least where, as here, the alleged aider and abettor owes a fiduciary duty to the defrauded party,[9] recklessness satisfies the scienter requirement. We arrive at this conclusion for several reasons.
 
 
 18
 First, by leaving open the possibility that recklessness might satisfy the scienter requirement, the Supreme Court recognized that in certain instances a recklessness standard might be appropriate. See Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1044 (7th Cir. 1977) ("no hint in Hochfelder that the Court intended a radical departure from" common law analogue of fraud which imposes liability for reckless behavior), cert. denied, --- U.S. ----, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). The relationship most logically subjected to a recklessness standard, rather than some stricter standard involving proof of intent to defraud, is where the aider and abettor owes a direct fiduciary duty to the defrauded party. See Woodward v. Metro Bank of Dallas, 522 F.2d 84, 97 (5th Cir. 1975). Liability premised on the recklessness of one's fiduciary in failing to perform his duty to disclose is a far cry from awarding damages for simple negligence. See Ernst & Ernst v. Hochfelder, supra. Clearly, Stott, as Rolf's broker, owed Rolf a fiduciary duty. See Hanly v. SEC, 415 F.2d 589, 596, 597 (2d Cir. 1969).[10]
 
 
 19
 Second, on a linguistic level, the term scienter[11] is used by the Supreme Court to mean, in the disjunctive, "knowing or intentional misconduct." 425 U.S. at 197, 96 S.Ct. 1375.[12] Use of the word "knowing" implies conduct which is somewhat less directed and focused than "intentional" activity which commonly is characterized by a specific mental state whose animus is to bring about a particular result, see W. Prosser, Law of Torts § 107, at 700 (4th ed. 1971). "Knowing" is a word laden with common law connotations: at common law, reckless conduct is viewed as a form of knowing conduct. Id. at 701. For example, the common law requirement of scienter as an element of the tort of deceit or misrepresentation may be proved in a number of ways:
 
 
 20
 There is of course no difficulty in finding the required intent to mislead where it appears that the speaker believes his statement to be false. Likewise, there is general agreement that it is present when the representation is made without any belief as to its truth, or with reckless disregard whether it be true or false.
 
 
 21
 Id. (footnotes omitted). It is unquestionable that the common law has served as an interpretive source of securities law concepts. See Holdsworth v. Strong, 545 F.2d 687, 693-94 (10th Cir. 1976), cert. denied, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977). The common law tort of fraud has adopted a recklessness standard as one means of satisfying the requisite intent element of that cause of action.[13] Similarly, securities law cases have recognized that recklessness may serve as a surrogate concept for willful fraud. Concurring in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 868 (2d Cir. 1968) (en banc), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), Judge Friendly noted the distinction between a "merely negligent misstatement" and "the kind of recklessness that is equivalent to wilful fraud." See Haimoff, Holmes Looks at Hochfelder and 10b-5, 32 Bus.Law 147, 162 (1976).
 
 
 22
 Third, it is consistent with, if not demanded by, precedent in this circuit[14] to hold that reckless conduct satisfies the scienter requirement. See Lanza v. Drexel & Co., 479 F.2d 1277, 1306 (2d Cir. 1973) (en banc); Shemtob v. Shearson Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971); Bucklo, The Supreme Court Attempts to Define Scienter Under Rule 10b-5 : Ernst & Ernst v. Hochfelder, 29 Stan.L.Rev. 213, 214 (1977). Lanza v. Drexel, supra, of course required scienter as an element of a 10b-5 cause of action prior to the Supreme Court's decision in Hochfelder. The Lanza test was stated in terms of "willful or reckless disregard for the truth," id. at 1306 (emphasis added), thereby recognizing that either intentional or reckless behavior is the predicate mental state for 10b-5 liability. The Hochfelder Court noted that a number of courts of appeals "have held that some type of scienter i. e., intent to defraud, reckless disregard for the truth, or knowing use of some practice to defraud is necessary in such an action" and then cited inter alia our decision in Lanza, 425 U.S. at 194 n. 12, 96 S.Ct. at 1381. Thus, on balance, we consider that Hochfelder left intact our rule that recklessness is a form of scienter in appropriate circumstances.[15]
 
 
 23
 A final basis for applying a recklessness standard in certain instances rests perhaps on the practical problem of proof in private enforcement under the securities laws. Proof of a defendant's knowledge or intent will often be inferential, see Ruder, Multiple Defendants in Securities Law Fraud Cases : Aiding and Abetting, Conspiracy in Pari Delicto, Indemnification, and Contribution, 120 U.Pa.L.Rev. 597, 635 (1972), and cases thus of necessity cast in terms of recklessness. To require in all types of 10b-5 cases that a factfinder must find a specific intent to deceive or defraud would for all intents and purposes disembowel the private cause of action under § 10(b).
 
 
 24
 2. Other elements of aiding and abetting liability. Given, then, that we find aider and abettor liability appropriate under § 10(b) and given that we believe at the very least that fiduciaries have acted with scienter when they have been reckless, we pass to the other well-established elements of the aiding and abetting cause of action. The first element that a plaintiff must prove is that the primary party, here Yamada, as distinguished from the secondary aiding and abetting party, committed a securities law violation. Woodward v. Metro Bank of Dallas, supra, 522 F.2d at 95; see SEC v. Coffey,493 F.2d 1304, 1316 (6th Cir. 1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); cf. Landy v. Federal Deposit Insurance Corp.,486 F.2d 139, 162 (3d Cir. 1973) (requiring "independent wrong" instead of independent securities law violation), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The district court found, and we see no basis for concluding otherwise, that Yamada's overall management of the account in violation of his fiduciary duties owed by reason of the investment advisory agreement was fraudulent. 424 F.Supp. at 1043. Indeed the district court called Yamada's handling of the account a "gross fraud." Id. Moreover, Stott and BEDCO in their brief acknowledge that Yamada committed securities fraud. Their very purpose is to point the finger at Yamada in order to exonerate Stott. Brief for Defendants-Appellees-Cross-Appellants at 28, 34, 42, 44, 47. There is therefore no reason to analyze Rolf's portfolio on a stock by stock basis to determine which purchases and sales constituted frauds upon Rolf, a more specific and particularized investigation which we might have to undertake if Yamada had merely manipulated two or three stocks without engaging in a more exhaustive and all-encompassing web of fraud.
 
 
 25
 The second requirement for establishing the aiding and abetting violation is Stott's knowledge of Yamada's fraud. We have indicated above that the scienter element may be satisfied by proof of reckless conduct. While the evidence in this case is not overwhelming, we believe it is sufficient to sustain Judge Pierce's findings on the basis of the clearly erroneous rule.
 
 
 26
 Reckless conduct is, at the least, conduct which is "highly unreasonable" and which represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977).[16] Stott was aware that the quality of the securities being purchased by Yamada was very low. The daily contact between Stott and Yamada gave Stott ample opportunity to supervise the investment advisor, an obligation which the lower court found Rolf had sought and Stott had undertaken to perform. Stott's most egregious breach of his duty to Rolf was his constant reassurance that Yamada knew what he was doing and that if Yamada were purchasing stocks they must be satisfactory. These representations were conclusorily made to Rolf without investigation and with utter disregard for whether there was a basis for the assertions. "A representation certified as true . . . when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability." State Street Co. v. Ernst, 278 N.Y. 104, 112, 15 N.E.2d 416, 418-19 (1938). Stott's representations and opinions were given without basis and in reckless disregard of their truth or falsity.
 
 
 27
 The third and final requirement to establish the aiding and abetting violation is that Stott rendered substantial assistance to Yamada in the fraudulent mismanagement of Rolf's portfolio. One commentator has suggested that substantial assistance might include "repeating . . . misrepresentations (or aiding in their preparation), by acting as conduits to accumulate or distribute securities, by executing transactions or investing proceeds, or perhaps by financing transactions." 2 A. Bromberg, Securities Law § 8.5 (515) (1974). In this case, Stott's assistance was both active and passive. He processed many of the relevant securities orders; he reassured Rolf of Yamada's competence; and he either recklessly failed to learn of or failed to disclose Yamada's web of fraud. See Woodward v. Metro Bank of Dallas, supra, 522 F.2d at 96-97. The effect of Stott's "hand-holding operation" was to prevent Rolf from discovering Yamada's fraud. Stott's acts, therefore, were a substantial causal factor in the perpetuation of Yamada's fraud and in the cumulation of Rolf's losses. See Landy v. Federal Deposit Insurance Corp., supra, 486 F.2d at 163. We therefore affirm the trial court's judgment to the extent that it found Stott an aider and abettor of Yamada's fraud.
 
 B. BEDCO
 
 28
 While there is disagreement among the circuits[17] and, perhaps, even disharmony within the Second Circuit[18] on the relationship between § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and the common law doctrine of respondeat superior, BEDCO has conceded "for the purposes of this appeal" that if Stott is found liable it is vicariously liable under Section 20, even though the decision below stated that "BEDCO did not have actual notice of the fraud."[19]
 
 V
 Damages
 
 29
 We are not capable of precisely measuring Rolf's damages on this appeal, although we do not think that they were so speculative as to compel resort solely to damages as in a churning case, for commissions paid the broker (and interest thereon). Accordingly, we remand to the district court to determine damages in accordance with the guidelines set forth below.
 
 
 30
 First, the district court should determine as near as possible the time when Stott began to aid and abet Yamada's fraud[20] and compute the market value of Rolf's portfolio on that date. Second, the district court should subtract the value of the portfolio on the date when Stott's participation in and assistance to the fraudulent scheme ceased from the value on the date when Stott became an aider and abettor. This amount is Rolf's gross economic loss.[21] See Note, Churning by Securities Dealers,80 Harv.L.Rev. 869, 884 (1967). The district court should then reduce Rolf's gross economic loss by the average percentage decline in value of the Dow Jones Industrials, the Standard & Poor's Index, or any other well recognized index of value, or combination of indices, of the national securities markets during the period commencing with Stott's aiding and abetting and terminating with its cessation.[22] Thus if during the relevant period the stock market declined in value by 25%, then Rolf's gross economic loss should be reduced by 25%. Because plaintiff's theory of liability is to the effect that Stott's aiding and abetting prevented Rolf's discovery of Yamada's fraud, it is not fair to reduce damages any further by the amount of loss on a discrete transaction to which Stott had no connection because he did not execute the transaction, recommend the security, or reassure Rolf with respect to that security.[23] However, should the loss on the Delanair stock be determined to have occurred during the aiding and abetting period, Rolf's damages must be reduced by $175,000, the amount for which he settled his claims against several Delanair-related defendants. We also hold that Rolf is entitled to a return of commissions paid to Stott and BEDCO, but only as to transactions falling within the aiding and abetting period, with interest thereon as determined by the district judge.
 
 
 31
 Finally, we request the district judge to reconsider his decision on the question of prejudgment interest in view of our obvious conclusion that Rolf was deprived of a principal sum. See Nelson v. Hench, 428 F.Supp. 411 (D.Minn.1977). While such an award is a matter of judicial discretion, Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Norte & Co. v. Huffines, 416 F.2d 1189, 1191-92 (2d Cir. 1969), cert. denied sub nom. Muscat v. Norte & Co., 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970), it is not unreasonable to request the district judge to set forth his reasons should he again deny prejudgment interest. See Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir. 1971).
 
 
 32
 Judgment affirmed in part and remanded.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 33
 I must respectfully dissent.
 
 
 34
 The majority holds a registered representative (Stott) and his employer (BEDCO) liable under § 10(b) and Rule 10b-5 to their customer (Rolf) for losses suffered by the customer upon purchases and sales of securities executed at the direction of Rolf's own independent investment adviser (Yamada) pursuant to written discretionary authority from Rolf instructing Stott and BEDCO to follow Yamada's orders. This result is achieved on the grounds that (1) the investment advisor (Yamada) was committing various frauds on the customer (Rolf), and (2) the broker (Stott), although he knew nothing of the frauds, "aided and abetted" Yamada's conversion of Rolf's account to unsuitable securities by "holding the hand" of Rolf pursuant to an oral agreement to "look after" Rolf's account and by assuring him of Yamada's competence as an investment counsel.
 
 
 35
 The majority views Yamada's investment of the account in unsuitable securities as fraud in and of itself and Stott's state of mind as recklessness amounting to a deliberate intent to deceive. All of this is too much for me to accept. The majority not only patches together watered-down notions of fraud and scienter in arriving at a result indistinguishable in any significant respect from that reversed by the Supreme Court in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), but also overlooks findings below and undisputed evidence that foreclose Rule 10b-5 liability.
 
 
 36
 With regard to the "fraud" by Yamada that Stott is held to have aided and abetted, Judge Pierce found, and the majority here seems to agree, that "Stott did not know of the direct frauds which Yamada was perpetrating on Rolf" such as the investment adviser's manipulation of the public market price of certain securities obtained for Rolf's account and the use of the purchasing power of that account to make purchases of securities that might improve the price for others. Nor is there any basis for a finding that Stott shut his eyes to any such manipulation or use of Rolf's account to help others. Indeed, it is undisputed that at all pertinent times Yamada's reputation as an investment adviser was excellent and his successful accomplishments in the trade were well known. Even on the majority's "aiding and abetting" theory, therefore, Stott could not be held responsible for Yamada's manipulations, since they were not known to Stott and would not have been readily apparent upon exercise of due diligence, including compliance with New York Stock Exchange Rule 405 ("know your customer" rule).
 
 
 37
 Because even the majority concedes that "Stott was ignorant" of Yamada's "stock manipulations," it becomes important to determine what was the fraud "aided and abetted" by Stott through some "reckless disregard" on his part. The majority opinion, making precious little mention of any frauds committed by Yamada, fails completely to describe or analyze the specific fraud or frauds that were furthered by Stott other than to suggest that they were "Yamada's investment decisions" and his conversion of Dr. Rolf's portfolio into securities that were highly speculative and of very low quality compared with the type of securities that had been there when the account had been managed directly by Mr. Stirling of BEDCO. What the district court labelled "tantamount to fraud" Yamada's investment of Rolf's account in unsuitable securities, so-called "high fliers," "junk," or "low quality" issues is characterized by the majority in conclusory fashion as part of "a more exhaustive and all-encompassing web of fraud." The majority's forbidding label cannot alter the fact that, when this case is stripped of the brooding omnipresence of Yamada's flagrant manipulations as it must be, nothing remains but an unfocused allegation that Stott lulled Rolf into acquiescence in Yamada's investment of his account in unsuitable securities. To hold that he thereby aided and abetted a Rule 10b-5 "fraud" is to confuse the common law duties of fiduciaries or accountants, see, e. g., Ultramares Corp. v. Touche, 255 N.Y. 170, 190, 174 N.E. 441, 449 (1931), with the limited prohibitions of § 10(b) and Rule 10b-5 against the use of any "manipulative or deceptive device or contrivance" in the purchase or sale of securities.
 
 
 38
 Even assuming arguendo that the investment of a customer's funds in unsuitable securities could on occasion rise to the level of Rule 10b-5 fraud, the majority errs in concluding that Stott's conduct, principally his assurances regarding Yamada's competency as investment counsel, coupled with Stott's personal belief that some of the investments were "junk," establishes recklessness equivalent to an intentional and deliberate participation in or aiding and abetting of such "fraud." In my view this determination violates fundamental principles established by the Supreme Court in Ernst & Ernst v. Hochfelder, supra, and stems from an erroneous concept of "recklessness" or "reckless disregard" of material facts.
 
 
 39
 In Hochfelder the Court reversed a decision of the Seventh Circuit which had held "that one who breaches a duty of inquiry and disclosure owed another is liable in damages for aiding and abetting a third party's violation of Rule 10b-5 if the fraud would have been discovered or prevented but for the breach. 503 F.2d 1100 (1974)." 425 U.S. at 191, 96 S.Ct. at 1380 (emphasis added). The Supreme Court held that proof of scienter, i. e., an "intent to deceive, manipulate or defraud," was essential and that this element was not satisfied by proof of negligence or breach of a duty to inquire. It left open the "question whether, in some circumstances, reckless behavior" might be treated as the equivalent of scienter, 425 U.S. at 194 n. 12, 96 S.Ct. at 1381.
 
 
 40
 While Hochfelder did not clarify entirely the meaning of scienter, it did make clear that the failure of a fiduciary or accountant to fulfill a "common-law and statutory duty of inquiry," 425 U.S. at 192, 96 S.Ct. at 1380, which would reveal fraud on someone else's part, is not without more the equivalent of scienter as defined by the Court. Since Hochfelder we have reiterated that
 
 
 41
 " . . . before (a party) can be held liable as an aider and abetter, there must be a showing that (such a party): (a) knew of the investment adviser-client relationship; (b) had knowledge of the fraud; and (c) acted in concert with the investment adviser. Cf. Ernst & Ernst v. Hochfelder, 425 U.S. 185 (96 S.Ct. 1375, 47 L.Ed.2d 668) (1976)." Abrahamson v. Fleschner, 568 F.2d 862, at 871-872 n. 16 (2d Cir. 1977).
 
 
 42
 See also Hirsch v. du Pont, 553 F.2d 750, 759 (2d Cir. 1977) ("knowing assistance of or participation in a fraudulent scheme gives rise to liability under § 10(b) as an aider and abettor . . . knowledge of the fraud . . . is indispensable"); Kerbs v. Fall River Indus., Inc., 502 F.2d 731, 739-40 (10th Cir. 1974); SEC v. Coffey, 493 F.2d 1304, 1316 (6th Cir. 1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). Accordingly, in my view, before "reckless disregard" may be equated to scienter, there must be a showing that the party charged with violation of Rule 10b-5 deliberately shut his eyes to the obvious, such as material facts that would be patent upon a mere cursory examination or review.[1] Failure to conduct an investigation even if required by one's status as a fiduciary will not suffice.
 
 
 43
 Judged by this standard, the facts as stated by the majority fail to support a conclusion that Stott participated in any fraud with the scienter required by Hochfelder. As proof that Stott "rendered substantial assistance to Yamada in (his fraud)," the majority relies upon Stott's processing of Yamada's securities orders given pursuant to his discretionary authorization from Rolf, Stott's representations to Rolf to the effect that Rolf could depend on his adviser's judgment, and Stott's failure to disclose Yamada's fraud (i. e., the purchase of low-grade securities). However, the majority is vague as to how any of this conduct can be said to have been undertaken with the "reckless disregard" that must be treated as the equivalent of knowledge of Yamada's fraud. Apparently, the theory of the majority opinion is that Stott's continuing expressions of confidence in Yamada and his willingness to accept the adviser's orders were reckless in view of his "(awareness) that the quality of the securities being purchased by Yamada was very low." The opinion describes Stott's reassurances regarding Rolf's reliability as having been made "conclusorily . . . without investigation and with utter disregard for whether there was a basis for the assertions." Likewise, it states that Stott "either recklessly failed to learn of or failed to disclose Yamada's web of fraud" again referring only to the purchase of unsuitable securities. However, even conceding that Stott believed some or many of Yamada's purchases to be "junk", it would have required a considerable investigation for him to determine whether Yamada's widely-recognized reputation for brilliance was unwarranted or whether the ratio of risk to return on Rolf's portfolio as a whole was consonant with the doctor's investment objectives. A failure to perform such an investigation without more does not, after Hochfelder, establish scienter.
 
 
 44
 Sympathetic as I am to vigorous enforcement of the antifraud provisions of our federal securities laws, I cannot subscribe to a process of extrapolation, approved by the majority opinion, whereby Yamada's investment of Rolf's account in unsuitable securities is elevated to the level of Rule 10b-5 fraud and Stott's personal belief that some of the investments were "junk" is recognized as a sufficient basis for concluding that he acted with scienter. Reasoning along these lines, the majority has ended up with a holding that is virtually indistinguishable from that reversed in Hochfelder. A broker (Stott) is held liable under Rule 10b-5 for negligence in failing to make an adequate inquiry into the investments recommended by the plaintiff's investment adviser (Yamada), who turned out to be dishonest even though widely acclaimed as a competent and successful investment adviser at the time. In short, stripped of its conclusory characterizations, the majority opinion would barely make out a case of negligence on the part of Stott, much less one of his deliberately shutting his eyes to facts that would have revealed the "fraud" on Yamada's part. When additional lower court findings and undisputed evidence, unmentioned or glossed over by the majority, are taken into account, the failure to make out a case of "fraud" based on unsuitable investments or aiding and abetting of that fraud by recklessness becomes apparent. In the first place, Dr. Rolf was no novice or "babe in the woods" in the investment field. He had had 19 years of experience, including 10 years completely on his own, during which he was his own adviser and the supervisor of various trading accounts maintained by him with several different Cleveland brokers. Having tasted success in the predominantly bull market of the 1950s and 1960s, Rolf had advised Stirling of BEDCO as early as June, 1967, that his "objective (was) to double my equity" and told Yamada as late as September 1970 (after the value of his portfolio had greatly declined, principally because of investments made by Yamada), "As you recall, we started out with roughly $2,000,000 of Securities which could be used for trading. . . . It was my impression that we would wind up with 3.5 to 5 million in a year's time."
 
 
 45
 The picture that emerges from these and other statements made by Rolf is one of a sophisticated investor in securities who was well aware of the difference between gilt-edge, relatively safe securities, on the one hand, and speculative "high fliers," on the other, and who had determined to get richer quick by choosing an aggressive program involving high-risk, OTC stocks in the hope that his adviser would succeed in picking a few big winners, but well aware of the pitfalls that were involved.[2]
 
 
 46
 From this record it is small wonder that when introduced by Stott to a couple of prospective investment advisers, whom he personally interviewed, he chose 26-year old Yamada, "one of the 'new breed' of young money-managers who had emerged as highly successful in the stock market" during the late 1960s by dealing in special situations, mutual funds, new issues, hedge funds and assorted speculative ventures.[3] Rolf's correspondence discloses that he could hardly be classified as a naive, trusting person of limited intelligence looking for safe investments designed to yield substantial income and security. Rolf testified that he "wanted somebody other than Stott" to handle his account. In short, he wanted to gamble on some "high fliers" and for this he looked to Yamada, not Stott. Indeed, Rolf never even met Stott in person until October, 1970, some 17 months after Rolf had selected Yamada as his investment adviser. By that time Rolf's portfolio had declined in market value from $1,423,000 to approximately $223,000.
 
 
 47
 The tenuousness of holding Stott liable as an aider and abettor is further underscored by the anomalous nature of his responsibilities toward Rolf, once Rolf had chosen Yamada rather than BEDCO to advise him as to his investments. The oral Rolf-Stott arrangement, according to Judge Pierce's findings, was that while Yamada alone would have discretionary responsibility with respect to what was to be bought and sold for Rolf's account, Stott would "supervise his (Rolf's) account and Rolf understood that Stott was to look after his interests." In such a context the role of overseer, in the absence of some fixed written delineation of authority and responsibility, borders on the meaningless.[4] It is an elementary market fact, which should be judicially noticeable, that since there are literally thousands of business ventures traded on various exchanges in the United States, it is impossible for any one investment adviser or brokerage concern to follow all traded business ventures closely or to maintain sufficient information with respect to each and every one to furnish an informed expert opinion with respect to its prospects as an investment. As a result, each investment adviser and group of security analysts on the staff of a broker or investment banking concern usually limits itself to in-depth study of a fraction of the entire gamut, maintaining a detailed analysis of each company in the selected group, based on studies of every available bit of information about it, including visits to and conferences with its top personnel, customers and others. Although an adviser or brokerage house may have expertise with respect to companies within its selected group, it would have much less knowledge, or even none, about hundreds of other traded companies unless it undertook a special study.
 
 
 48
 If Rolf had looked to Stott and BEDCO for investment counsel, as he had to Stirling, Stott would undoubtedly have learned more about Rolf's investment objectives and maintained for him a portfolio of securities with which BEDCO's experts were intimately familiar. As it was, Stott was justified in relying upon Yamada's expertise with respect to the securities recommended by him. Although Stott may have personally thought that some of the latter were "junk" or "high fliers" it must be remembered, first, that Yamada then enjoyed an excellent reputation as a successful adviser. Once a student at the Harvard Business School, he had risen rapidly to the position of officer in the investment banking firm of Kuhn Loeb & Co., described by Judge Pierce "as a conservative and prestigious firm which generally handled 'triple-A' clients," where Yamada developed "expertise in research and 'special situations'." Yamada had then left Kuhn Loeb to form a partnership with others, including Keither Funston, former President of the New York Stock Exchange, John Burns, former President of RCA and Chairman of the Board of Cities Service, and J. Richardson Dilworth, head of the Rockefeller Brothers Fund. Yamada was well known in the securities field, managed approximately $20 million for customers and was in daily consultation with numerous securities firms. Rolf himself, an experienced trader on his own behalf, after personally interviewing Yamada was favorably impressed by him as "very brilliant and capable."
 
 
 49
 In short, although Rolf later testified, after Yamada's advice had proved disastrous, that he had "expected BEDCO to look after his account," (emphasis added), Rolf never put this in writing or defined precisely what was to be BEDCO's area of responsibility other than to keep him advised as to what securities were being purchased and sold for the account. On the contrary, by letter dated May 9, 1969, to BEDCO Rolf directed, "You will kindly follow his (Yamada's) instructions in every respect concerning my account with you . . . as he may order and direct." Rolf had what amounted to a custody account with BEDCO. When it came to investment decisions, although Stott (whom Rolf had never met and hardly knew) made recommendations to Yamada, it was clear that Yamada was in command.[5]
 
 
 50
 Against such a background, I fail to find any substantial basis for holding that Stott's assurances to Rolf, made long prior to the time when Yamada's fraud and manipulations became known, regarding Yamada's competence and Stott's expressions of opinion to the effect that if Yamada recommended certain investments they must be all right, constituted aiding and abetting of any fraud on Yamada's part.[6] Although Stott might have personally considered some of the investments made by Yamada to be unproved and hence "junk," it would have been foolhardy for him to voice such a view to Rolf, since Yamada, who was in command and had gained his reputation in part from his successful dealing in special situations, might well be possessed of detailed information not available to or obtained by BEDCO or Stott. Absent evidence to the contrary, we cannot assume that Stott's views were based on independent research, as distinguished from hunch. Some of the greatest gains and widest movements in traded securities have occurred in OTC stocks, of which astute advisers have taken advantage because of intensive private investigation revealing business prospects or probable takeovers not generally known. In this case, for instance, as Judge Pierce noted, "Yamada made fairly substantial profits for Rolf on short-term trading in six of the seven manipulated stocks" which he bought for Rolf in 1970. 424 F.Supp. at 1034.
 
 
 51
 An analysis of the securities issues purchased by Yamada for Rolf reveals that many of the investments, although they declined in market value when the bloom faded on the bull market, were concededly not unsuitable, that others were listed on major stock exchanges, and that some "unsuitable" issues turned out to be profitable. Of the 40-odd security issues purchased for Rolf's account which form the basis of his claim, the district court found that Stott had "either recommended or was somewhat involved with the decision to purchase the following twelve."[7] There is no evidence that any of these 12 were unsuitable for Rolf's account. Nor was there any testimony as to the suitability of certain other securities bought for Rolf.[8]
 
 
 52
 Under these undisputed circumstances, including Yamada's investment of a substantial portion of Rolf's account in apparently suitable securities, I cannot share the majority's conclusion that investment of the balance in securities labelled unsuitable by an expert witness amounts to fraud, much less that Stott's conduct aided and abetted such "fraud." I favor holding a broker to his duties under Rule 405, for violation of which remedies are provided by the New York Stock Exchange, N.Y.S.E. Constitution Art. VIII, Rules 481, et seq. (providing for arbitration of disputes between member firms and others) and §§ 6, 13 (authorizing suspension, expulsion, fines and censure), and an investment adviser for fraud in violation of the Investment Advisors Act, see Abrahamson v. Fleschner, 568 F.2d 862 (2d Cir. 1977). But to hold that investment of a customer's account in unsuitable securities constitutes § 10(b) fraud and that a broker who executes orders given by an investment adviser pursuant to his discretionary authority may be held liable as an aider and abettor of such fraud, places an extraordinary and unconscionable burden on both the adviser and the broker.
 
 
 53
 Nor do I agree with the district court's view that an implied right of action for damages in favor of Rolf may be based on Stott's alleged violations of N.Y.S.E. Rule 405[9] or Article III, § 2, of the Rules of Fair Practice of the National Association of Securities Dealers.[10] Accepting the premise that "the court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation," Colonial Realty Corp. v. Bache & Co., 358 F.2d 178, 182 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), we must also follow the guidelines established by the Supreme Court in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which require us to determine (1) whether the plaintiff is a member of the class for whose especial benefit the law was intended; (2) whether Congress expressed any preference for or against a remedy; (3) whether a private action would be consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one in an area traditionally relegated to state law.
 
 
 54
 Applying these guidelines, it is not at all clear that Rule 405 or Art. III, § 2, were intended solely for the particular benefit of investors. Indeed, they appear designed as much to protect brokers from being victimized by unscrupulous customers. See Landy v. FDIC, 486 F.2d 139, 166 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). To imply a damages remedy based on nonfeasance or gross negligence would, moreover, run counter to the principles of Hochfelder and possibly inhibit the NYSE and NASD from promulgating additional standards for the guidance of their members. In short, NYSE and NASD rules are not the same for the purpose of implied remedies as SEC rules. See Jenny v. Shearson, Hammill & Co., (1974-75 Transfer Binder) Fed.L.Sec.Rep. (CCH) P 95,021, at 97,582 (S.D.N.Y.1975); Plunkett v. Dominick & Dominick, 414 F.Supp. 885 (D.Conn.1976). Lastly, whatever obligation might be imposed by rule on a broker dealing solely with his customer, the interposition of an investment adviser with the sole discretionary authority to determine what investments shall be made for the customer weighs against extending any liability of the broker that might otherwise be implied on the basis of a direct broker-customer relationship.
 
 
 55
 For these reasons, I would reverse the judgment of the district court and remand with directions to enter judgment in favor of the defendants dismissing the action.
 
 
 
 [1]
 The opinion below is reported at 424 F.Supp. 1021 (S.D.N.Y.1977)
 
 
 [2]
 Yamada and Rolf settled their differences; Yamada is therefore not a party to the cross appeals
 
 
 [3]
 The securities included Anaconda Co., Asamera Oil Corp., Avnet Inc., Buttes Gas & Oil Co., CNA Financial Corp., Cities Service Co., Ebasco Industries Inc., Glen Alden Corp., INA Corp., International Industries Inc., General Electric Co., Leesona Corp., Levin Townsend Computer Corp., Loew's Theatres Inc., National General Corp., Occidental Petroleum Corp., Penn Central Co., Pittson Co., Raytheon Corp., Scientific Resources Corp., Teledyne, Inc., Loew's Theatres (warrants), and Leasco Data Processing (warrants)
 
 
 [4]
 At this time the portfolio consisted principally of securities sold over the counter (OTC) and of low quality: Delanair, Inc. (restricted), Food Fair Properties, Inc., Holobeam, Inc., Monarch Industries, Inc., Synchronex Corp., West Coast Production Co., Benquet Consolidated Corp., Equity Funding Corp., Outlet Company, and Simplex Wire & Cable Co
 
 
 [5]
 These included Simplex Wire & Cable Co., Teradyne, Inc., Standard Oil of New Jersey, Reading & Bates Offshore, Intertherm, Inc., Food Fair Properties, International Funeral, Natomas Corp., Asamera Oil Corp., Carter Wallace, Inc., West Coast Production, and Equity Funding Corp
 
 
 [6]
 There is no case decided by this court upholding, but there are several cases discussing, this theory of liability. NYSE Rule 405 requires a broker to "know (his) customer." Art. III § 2 NASD imposes supervision and suitability requirements on brokers. See Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135, 141 (7th Cir)., cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969); Starkman v. Seroussi, 377 F.Supp. 518 (S.D.N.Y.1974); cf. Colonial Realty v. Bache & Co., 358 F.2d 178 (2d Cir.) (no liability under 1934 Act for failure to employ "just and equitable" principles of trade as required by NASD), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). See also Van Alen v. Dominick & Dominick, Inc., 560 F.2d 547, 552 (2d Cir. 1977); Van Gemert v. Boeing Co., 520 F.2d 1373, 1379-82 (2d Cir.), cert. denied, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975)
 
 
 [7]
 The requirement of scienter has been the rule in this circuit for some time. See Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973) (en banc); Sonde & Freedman, "Seagulls on the Water Some Ships in a Storm": A Comment on Lanza v. Drexel, 49 N.Y.U.L.Rev. 270 (1974)
 
 
 [8]
 Hochfelder was pursued on an aiding and abetting theory
 
 
 [9]
 We need not reach the question whether recklessness satisfies the scienter requirement where the alleged aider and abettor owes no duty of disclosure and of loyalty to the defrauded party. See Hirsch v. duPont, 553 F.2d 750, 759 (2d Cir. 1977)
 
 
 [10]
 We reject Stott's argument that the trading authorization given to Yamada relieves Stott of any duty to Rolf and thus of any liability. Stott was still Rolf's broker, though not his investment advisor, and owed Rolf a duty of loyalty normally expected of brokers. In addition, in view of the finding that Stott undertook to oversee Yamada's actions, the question whether a trading authorization, by itself, would serve to relieve a broker-dealer of liability is not before us
 
 
 [11]
 Scienter is the Latin word for "knowingly." See Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, 540 F.2d 27, 33 (2d Cir. 1976)
 
 
 [12]
 It has been suggested that other language in Hochfelder mandates the conclusion that recklessness will not satisfy the scienter requirement. That language states:
 Use of the word "manipulative" is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.
 425 U.S. at 199, 96 S.Ct. at 1384 (footnote omitted). However, at another point in the opinion, footnote 12 is appended to the language "allegation of 'scienter' intent to deceive, manipulate, or defraud." Id. at 193, 96 S.Ct. at 1381. Footnote 12 then recognizes that "(i)n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." Id. at 194 n. 12, 96 S.Ct. at 1381.
 The Hochfelder opinion also noted:
 Although the extensive legislative history of the 1934 Act is bereft of any explicit explanation of Congress' intent, we think the relevant portions of that history support our conclusion that § 10(b) was addressed to practices that involve some element of scienter and cannot be read to impose liability for negligent conduct alone.
 425 U.S. at 201, 96 S.Ct. at 1385 (emphasis added). The Court seems to have recognized that scienter is not a rigid concept encompassing only the definitive intent to accomplish a specific purpose. A less definitive mental state recklessness would seem to suffice in certain circumstances and does not run afoul of Hochfelder's admonition that liability not be imposed for "negligent conduct alone." Id. See generally, Note, Recklessness Under Section 10(b) : Weathering the Hochfelder Storm, 8 Rutgers Camden L.J. 325, 342-45 (1977).
 
 
 [13]
 See, e. g., Ultramares Corp. v. Touche, 255 N.Y. 170, 190, 174 N.E. 441, 449 (1931) ("negligence or blindness, even when not equivalent to fraud, is nonetheless evidence to sustain an inference of fraud. At least this is so if the negligence is gross ") (emphasis added). If Ultramares left open the common-law door on the recklessness issue, State Street Co. v. Ernst, 278 N.Y. 104, 112, 15 N.E.2d 416, 418-19 (1938), closed it:
 Accountants, however, may be liable to third parties, even where there is lacking deliberate or active fraud. A representation certified as true to the knowledge of the accountants when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.
 See Restatement (Second) of Torts § 526(b), Comment at 60 (1965).
 
 
 [14]
 Other courts have held that a recklessness standard is consistent with Hochfelder. See, e. g., Sanders v. John Nuveen & Co., Inc., 554 F.2d 790, 792 (7th Cir. 1977); Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1040, 1043-45 (7th Cir. 1977) (reckless nondisclosure), cert. denied, --- U.S. ----, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); Bailey v. Meister Brau, Inc., 535 F.2d 982, 993-94 & n. 14 (7th Cir. 1976) (reckless disclosure); Stern v. American Bankshares Corp., 429 F.Supp. 818, 825 (E.D.Wis.1977); McLean v. Alexander, 420 F.Supp. 1057 (D.Del.1976). But see SEC v. American Realty Trust, 429 F.Supp. 1148, 1171 & n.8 (E.D.Va.1977) (recklessness does not satisfy Hochfelder )
 
 
 [15]
 A major purpose of the Hochfelder decision was to foreclose "liability for wholly faultless conduct where such conduct results in harm to investors." 425 U.S. at 198, 96 S.Ct. at 1383. Adoption of a recklessness standard in this case does not result in liability for "wholly faultless conduct" and thereby does not impede an important policy of § 10(b) and Rule 10b-15 as recognized in Hochfelder. Hochfelder itself found that "(t)here is no indication that Congress intended anyone to be made liable for such practices unless he acted other than in good faith. The catchall provision of § 10(b) should be interpreted no more broadly." 425 U.S. at 206, 96 S.Ct. at 1387. Reckless behavior hardly constitutes good faith. Since good faith does not constitute a defense to reckless or intentional conduct, a recklessness standard is fully consistent with Hochfelder on its own terms. See McLean v. Alexander, supra, 420 F.Supp. at 1081
 
 
 [16]
 For purposes of this decision we need not determine whether Stott's conduct would qualify as reckless under a less strict test as set forth in, e. g., Stern v. American Bankshares Corp., supra, 429 F.Supp. at 827 ("plaintiff must allege . . . that the defendants knew or should have known of the facts and circumstances concerning the fraud") (emphasis added)
 
 
 [17]
 Compare Hollaway v. Howerdd, 536 F.2d 690, 694-95 (6th Cir. 1976) (§ 20(a) has not supplanted doctrine of respondeat superior); Fey v. Walston & Co., 493 F.2d 1036, 1051-52 (7th Cir. 1974) (same), with Zweig v. Hearst Corp., 521 F.2d 1129, 1132-33 (9th Cir.) (§ 20(a) has supplanted doctrine of respondeat superior), cert. denied, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). A similar difference of opinion exists with respect to the analogous "controlling persons" liability provision, § 15 of the 1933 Act, 15 U.S.C. § 77o. Compare Johns Hopkins University v. Hutton, 422 F.2d 1124, 1130 (4th Cir. 1970) (respondeat superior not supplanted by § 15), cert. denied, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); Armstrong, Jones & Co. v. SEC, 421 F.2d 359, 362 (6th Cir.) (same), cert. denied, 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970), with Kamen & Co. v. Paul H. Aschker & Co., 382 F.2d 689, 697 (9th Cir. 1967), cert. granted, 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129 cert. dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968) (discussion of derivative liability for securities violations solely by virtue of §§ 15 and 20(a) after conclusion of no liability under agency principles with respect to common law counts)
 
 
 [18]
 Compare SEC v. Management Dynamics, Inc., 515 F.2d 801 (2d Cir. 1975), with SEC v. Geon Industries, Inc., 531 F.2d 39 (2d Cir. 1976)
 
 
 [19]
 This permits us to avoid resolution of the rather thorny controlling person-respondeat superior issue as well as to leave for another day resolution of the even thornier issue of liability under NYSE or NASD rules, note 6 supra
 
 
 [20]
 Of course Stott's liability is predicated on his contractual involvement in the management of Rolf's account, representing as he did one-half of the "Stirling-type operation." But Stott may not have been an aider and abettor from the moment Rolf executed the trading authorization to Yamada. That will depend on the district court's view of Stott's conduct in light of the three-part test of aiding and abetting liability discussed above
 
 
 [21]
 What we have referred to as Rolf's gross economic loss on a portfolio-wide basis during a relevant period of time is often referred to as a rescission measure of damages. 3 A. Bromberg, supra at 9.1; see Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1173 (2d Cir. 1970). This case is, however, somewhat different from the typical rescission situation as in Chasins. Here Stott's participation in Yamada's fraud infected Rolf's portfolio during a specific period of time to be determined on remand. In a sense the portfolio will be deemed sold as of the last day of the aiding and abetting period in order to determine what the resale price would have been if the portfolio had been liquidated on that day. See generally Mullaney, Theories of Measuring Damages in Security Cases and the Effects of Damages on Liability, 46 Fordham L.Rev. 277, 284-85 (1977)
 
 
 [22]
 Rolf's portfolio, even if it had not been fraudulently mismanaged, would have declined in value during the bear market of the aiding and abetting period. Stott and BEDCO have no responsibility for the general decline in economic conditions. The rescission theory of damages which we essentially utilize here cannot restore a plaintiff to a better position than he would have been in if the fraud had not occurred. See generally Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1304-06 (2d Cir. 1973); 3 A. Bromberg, supra at 9.1 & n.2. SEA § 28(a), 15 U.S.C. § 78bb(a), limits recovery to "actual damages."
 Some courts, albeit in different securities law contexts, have used technical computations to limit recoveries to actual damages. See Mills v. Electric Auto-Lite Co., 552 F.2d 1239, 1248 (7th Cir. 1977) (technical damages formula to measure fairness of merger), cert. denied, --- U.S. ----, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977) (No. 77-331); Bonime v. Doyle, 416 F.Supp. 1372, 1377, 1386 (S.D.N.Y.1976) (factoring out of damages computation "losses attributable to 'unique characteristics of a particular . . . .' " by using two indices composed of stocks of comparable value to the stock at issue); Feit v. Leasco Data Processing Equipment Corp., 332 F.Supp. 544, 586 (E.D.N.Y.1971) (reducing trading losses by decline in the Standard & Poor's Daily Stock Price Index). Feit has been criticized for utilizing a "broad-based index" without considering whether the index as a whole was similar in nature to the security under consideration. Reder, Measuring Buyers' Damages in 10b-5 Cases, 31 Bus.Law. 1839, 1850 (1976). Here, of course, Rolf's portfolio consisted of numerous stocks. At the outset of Yamada's stewardship, they were of generally high quality. If the district judge should determine that, when the aiding and abetting period began, the quality of stocks in the portfolio was such that a broad-based index would not be representative of those stocks, then he may select a more appropriate gauge, perhaps a portion of an index, perhaps a composite of indices, perhaps expert opinion. See generally, Mullaney, supra note 21, at 288-90.
 
 
 [23]
 Rolf, for example, may not collect damages for losses in accounts opened at other brokerage houses where those accounts were managed by himself and not Yamada or without Stott's participation or knowledge
 
 
 [1]
 The cases cited by the majority do not warrant the recognition of any more inclusive definition of scienter. See, e. g., Lanza v. Drezel & Co., 479 F.2d 1277, 1306 & n. 98 (2d Cir. 1973) (en banc) (judgment for defendant affirmed; no showing that he "willfully closed his eyes to or turned his back" on the fraud; material failure to disclose must be apparent "without any extraordinary effort."); Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977) (no finding that "danger was either known to the defendant or so obvious that the defendant must have been aware of it")
 
 
 [2]
 Judge Pierce found Rolf to be a "sophisticated" investor, willing to take "substantial risks" and "to engage in extensive trading," who "wanted a very aggressive investment program" and "kept careful watch over his securities," verifying current market prices frequently and employing a bookkeeper to follow his investments
 
 
 [3]
 Rolf and Yamada both testified that from the outset of their relationship it was agreed that in an effort to obtain a greater capital gain on Rolf's investments than he was presently able to realize Yamada would be making changes in Rolf's portfolio
 
 
 [4]
 The weakness inherent in attempting to predicate liability on Stott's telephonic agreement to "look after" Rolf's account is underscored by Rolf's maintenance of accounts with at least seven brokerage concerns other than BEDCO, through which purchases and sales were executed, some on Yamada's advice, at a net loss of $133,229, without the knowledge or participation of Stott or BEDCO. The other concerns included Lynch, Jones & Ryan; Kordich, Victor & Neufeld; Woodcock, Moyer, Fricke & French; Provident Securities; Bearwald & DeBoer; Amswiss International; and Laird Incorporated. Although it seems that Stott often received notice of transactions conducted through firms other than BEDCO, he was hardly in a position to influence specific purchases or sales
 
 
 [5]
 Rolf also appears to have made some investment decisions that may not have been shared even by Yamada, much less by Stott. For instance, in June 1969, Rolf opened a non-discretionary account with Hornblower & Weeks-Hemphill & Noyes, through which he purchased
 American Scientific Corp.
 Dasa Corp.
 Data Network Mega Systems, Inc.
 Ampex Corp.
 Mohawk Data Science.
 
 
 [6]
 Moreover, the generality of Stott's conclusory assurances "that Yamada knew what he was doing and that if Yamada were purchasing stocks they must be satisfactory" must have made it readily apparent to Rolf from the outset that Stott was relying on Yamada's excellent reputation rather than on an investigation into the merits of each investment, conducted personally or through BEDCO's staff of analysts. Otherwise, he would have reported to Rolf on the results of his independent research. Yet Rolf never requested or received any such check-up, even though he was well aware from past experience of BEDCO's facilities
 
 
 [7]
 The 12 were:
 Simplex Wire & Cable Co.
 Teradyne, Inc.
 Standard Oil of N. J.
 Reading & Bates Offshore
 Intertherm, Inc.
 Food Fair Properties
 International Funeral
 Natomas Corp.
 Asamera Oil Corp.
 Carter Wallace, Inc.
 West Coast Production
 Equity Funding Corp.
 
 
 [8]
 These include:
 Benquet Consolidated
 City Investing
 Consolidated Oil & Gas
 Funeral Homes of America
 Loews Theatres
 Outlet Co.
 Four Seasons Nursing Centers of America
 U.S. Natural Resources
 Milgo Electronic Corp.
 
 
 [9]
 Rule 405 provides in pertinent part:
 "Every member organization is required through a general partner, a principal executive officer or a person or persons designated under the provisions of Rule 342(b)(1) to
 "(1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.
 (and to)
 "(2) Supervise diligently all accounts handled by registered representatives of the organization."
 
 
 [10]
 Article III, § 2, provides:
 "In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."