UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

John B. LOWY, Defendant.

No. 98–CV–4605 (JS).

United States District Court,
E.D. New York.

March 14, 2003.

---

Carl A. Tibbetts, Esq., A. Lynne Wiggins, Esq., Assistant Chief Litigation Counsels, U.S. Securities & Exchange Commission, Washington, D.C., for Plaintiff.

Richard J. Morvillo, Esq., Jeffrey F. Robertson, Esq., Crowell & Moring LLP, Washington, D.C., for Defendant.

*MEMORANDUM, DECISION AND ORDER AFTER BENCH TRIAL*

SEYBERT, District Judge.

### INTRODUCTION

Plaintiff, United States Securities and Exchange Commission ("SEC"), commenced the instant action on July 8, 1998 against Latin American Resources, Inc. ("LARI"), John Lowy ("Lowy") and Harold J. Glasband ("Glasband"). Plaintiff alleged that Defendants violated Section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R. § 240.15c2–11 and Rule 13b2–1, 17 C.F.R § 240.13b2–1, by making material misrepresentations regarding the ownership and value of four Brazilian Plantations ("Plantations" or "Brazilian Plantations"). Final judgment was entered against LARI and Glasband on August 20, 1998, in accordance with a Consent & Undertaking.

## BACKGROUND

The SEC contends that material misstatements were made regarding the assets that LARI owned. Specifically, the SEC contends that LARI and its predecessors never had title to the Brazilian Plantations that constituted over 85% of LARI's claimed assets. Further, the SEC contends that even if LARI did have title, the value of the Plantations was grossly overstated. The SEC contends that a variety of "red flags" presented themselves that should have caused Lowy to realize that title was defective and that the values were overstated. The SEC contends that Lowy's failure to respond "appropriately" to these "red flags" indicates his knowledge, or at least reckless disregard, of the defects in the title and the overstated values.

Lowy denies the allegations and counters that LARI did in fact have good title to the Plantations and that their value was not overstated. Lowy further contends that even if LARI did not have good title and/or the values were overstated, he had no knowledge of those facts, was not reckless and indeed acted reasonably at all times. Lowy contends that the SEC's evidence of "red flags" amounts to second guessing with the benefit of hindsight and that none of the "red flags" amount to evidence of knowledge or recklessness on his part.

The Court presided over a ten-day bench trial beginning on March 12, 2001. Based upon the evidence and arguments presented, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact may be deemed conclusions of law, they also shall be considered conclusions. Likewise, to the extent that any of the conclusions of law may be deemed findings of fact, they shall be considered findings. *See Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405, 413–14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

## FINDINGS OF FACT

Defendant John B. Lowy, Esq. is an attorney who has practiced corporate and securities law for over thirty years. Tr. 1003. Lowy graduated from Tufts University in 1965 and from the University of Pennsylvania School of Law in 1968. Tr. 1003. Lowy was an initial officer, director and shareholder of Security Asset Management, Inc. ("SAMI"), he served as counsel to SAMI and was also responsible for the transaction in which SAMI merged into LARI. Tr. 307, 327–29, 1031–32. Lowy did not hold any officer or director position with LARI, although he was a shareholder and functioned as counsel to LARI on select occasions. Tr. 331, 1166–67.

Harold G. Glasband was also an initial officer, director and shareholder of SAMI. Tr. 311–12, 329–31. Glasband also served as the Chief Financial Officer of LARI. Tr. 330, 406. Judgment was entered against Glasband in this case after a settlement was reached in which he neither admitted nor denied any wrongdoing. Tr. 378. Glasband testified that his settlement in

this case was motivated by financial concerns and not by any belief on his part that he had violated the Securities Laws. Tr. 378.

LARI was a public company created when SAMI merged with a publicly traded company called Mining Corp. Tr. 1163–64. LARI obtained all of SAMI's assets as a result of the merger agreement. Tr. 1164–65. LARI filed a Rule 15c–211 Information Statement ("Information Statement") with the National Association of Securities Dealers ("NASD") and a Form 10–SB Registration Statement ("Registration Statement") with the SEC. Ex. 1, 2; Joint Stipulations 11, 13. Both filings listed the Brazilian Plantations as assets of LARI, valued at approximately $5 million. Ex. 1, 2; Joint Stipulations 9. Final judgment was also entered against LARI as a result of the Consent & Undertaking.

SAMI was a privately held Delaware corporation incorporated in November 1991. Ex. 22; Joint Stipulations 3. At the time of incorporation, Lowy was the sole officer of SAMI. Ex. 22, 24. Lowy was at all times the President of SAMI. Ex. 22. SAMI's offices were located at Lowy's law offices at 515 Madison Avenue, New York, New York. Tr. 75; Ex. 23, 28. Lowy, as President of SAMI, drafted and signed the agreements by which SAMI acquired, or attempted to acquire, the four Brazilian Plantations. Tr. 1045–60, Ex. 24, 76, 78, 88.

SAMI acquired, or attempted to acquire, three of the Brazilian Plantations, Sao Cristo, Noguiera and Enterpre ("Moura Plantations"), in a December 1991 transaction with Maria Assis Moura Neto ("Moura") and his sister Vera Moura, both Brazilian nationals. Tr. 1057–58; Ex. 62, 77, 79. The fourth Brazilian Plantation, Novo Horizonte, was purportedly acquired

in a December 1991 transaction with Suisse Bullion International Corporation ("Suisse Bullion"), a corporation controlled by one of SAMI's initial officers and shareholders, Michael Falkowitz ("Falkowitz")[1]. Tr. 504, 506, 1064–65; Ex. 62; Joint Stipulations 6.

In October 1993, SAMI formed a subsidiary, National Mining Corp., which conducted a reverse merger with Airline Software, Inc., a publicly traded company, and became a public company named Mining Corp. Tr. 1163–65. After the merger, SAMI transferred all of its assets into Mining Corp., by statutory merger in July 1993. Tr. 1164; Joint Stipulations 10. At the time of the statutory merger, Mining Corp. changed its name to LARI. Tr. 1164. As a result of the merger, LARI acquired all of the assets of SAMI, including the Brazilian Plantations that SAMI purported to be the owner of. Tr. 1164–65; Ex. 2.

### The Moura Transactions

In the fall of 1991, Falkowitz approached Lowy and Glasband to discuss the possibility of investing in the Brazilian Plantations. Tr. 305, 1029–30. The three agreed to acquire and develop the Brazilian Plantations. Tr. 305, 1029–30. The group determined that to raise the capital necessary to develop the Plantations, they would have to form a company to acquire the Plantations and then perform a reverse merger with a public company which would have access to financial resources. Tr. 305, 329, 596, 1037–38. To this end, Lowy prepared and filed, on behalf of SAMI, SAMI's certificate of incorporation in November 1991. Tr. 1030–31; Ex. 22; Joint Stipulations 3.

SAMI, through Falkowitz, began negotiations with the Moura's in November 1991 regarding the Moura Plantations. Tr. 1046, 1048, 586–88, 641. Negotiations pro-

---

**1.** Michael Falkowitz is also known as Michael Jacobs or Mike Jacobs.

gressed into December 1991 and on December 10, 1991, SAMI sent Moura a letter of intent regarding SAMI's proposed acquisition of the Moura Plantations. Tr. 1046; Ex. 76. At this time, Moura represented that the Moura Plantations were worth at least $50 million[2] and provided SAMI with documents concerning the Plantations which appeared to confirm the representations. Tr. 1046–47; Ex. 76.

On December 17, 1991, Moura came to New York to meet with Lowy, Glasband and Falkowitz. Tr. 1054–55, 379–80, 587–88. Moura again represented that he owned the Plantations free of encumbrances and that they were valued at over $50 million. He also provided further documentation regarding the Plantations. Tr. 1055–56. Lowy, Glasband and Falkowitz were convinced that the Plantations were valuable and would be a good investment. Tr. 382, 588, 637–38, 1073. Accordingly, on December 18, 1991, SAMI management again met with Moura, finalized the transaction and signed a purchase agreement. Tr. 384, 1057; Ex. 78.

The transaction, as structured by Lowy, was designed to protect SAMI's business interests. In this regard, Lowy structured Moura's compensation such that it was tied directly to SAMI's financial success. Tr. 1054. In fact, the bulk of Moura's compensation was originally in the form of an equity interest in the public company with which SAMI hoped to merge, and eventually was amended to compensate Moura with preferred stock with a liquidation value of $5 million. Tr. 1054; Ex. 62, 78. Lowy testified that he believed that structuring the transaction this way would eliminate any risk that Moura would somehow attempt to benefit at the expense of SAMI. Tr. 1054.

Lowy also structured the transaction to require Moura to provide numerous representations regarding the ownership and value of the Plantations. Ex. 78, Tr. 1060–63. Lowy testified that he stressed to Moura that by signing the purchase agreement, containing an "Exhibit A", he was representing that he was selling the three Plantations to SAMI with good title and no encumbrances. Moura was made aware that, in "Exhibit A", he was also representing his acquisition and development costs. Tr. 1061–62; Ex. 78. There is no evidence that Moura did not agree to make these representations or that there was any indication that the representations were fraudulent. In fact, testimony indicated that Moura accepted these representations without hesitation (Tr. 385–86, 1061–62) and that Moura suggested using Price Waterhouse to audit his costs and provide SAMI with audited financial statements. Tr. 1062. Lowy included in the purchase agreement a requirement that Price Waterhouse conduct the audit. Ex. 78.

Lowy testified that he understood that the most conservative and reliable method of valuing assets such as these was to use the costs of the predecessor owner. Tr. 1061, 1367–68. As such, Lowy insisted that Moura provide additional documentation regarding his costs and submit to an audit by a reputable accounting firm. Tr. 385–86, 496–96, 1061. Despite Lowy's repeated demands (Tr. 1109–1118, 1323–24; Ex. DF, 80), Moura failed to provide documentation of his costs. At the time the transaction was consummated, Lowy made efforts to structure it in a way to best protect SAMI's interests. SAMI management was ultimately pleased with the deal they had made. Tr. 360–61, 382, 387–89, 1102–03.

---

**2.** All values are stated in U.S. Dollars.

*The Falkowitz Transaction*

Lowy was familiar with the fact that Suisse Bullion, a company owned by Falkowitz, had purchased a Brazilian Plantation, Novo Horizonte, from Moura in or around 1989. Tr. 613–14, 1035–36. Lowy was also aware that Falkowitz had received a deed and an appraisal related to Novo Horizonte, which valued the property at approximately $60 million. Tr. 629–30, 633 1036–37. When Falkowitz approached Lowy and Glasband with the idea of forming a company to buy the Brazilian Plantations and develop them, the Novo Horizonte Plantation was included. Tr. 305, 1029–30, 1064–65. On December 18, 1991, SAMI purchased Novo Horizonte from Suisse Bullion at the same time that it purchased the Moura Plantations. Tr. 1064–65; Joint Stipulations 6.

The SEC presented the testimony of Paul Chernis ("Chernis"), Lowy's former law partner, to establish that Lowy knew, at the time of the December 18, 1991 transactions, that Falkowitz was not a trustworthy business partner. Chernis testified that, by 1989, he had come to believe that Suisse Bullion was a sham and that Falkowitz had forged a document he instructed Chernis to file in a lawsuit involving Suisse Bullion. Chernis testified that he discussed all of his concerns with Lowy and that Lowy told him that Falkowitz confessed to the forgery in 1990. Tr. 515–16, 522, 1086.

The Court finds that Chernis' testimony was not reliable and that the evidence established that Lowy did not know, at the time of the 1991 transactions, that Suisse Bullion was a sham or that Falkowitz had forged the document. Initially, the Court notes that Chernis' testimony regarding the dissolution of his partnership with Lowy was unreliable and tended to cast doubt on his credibility as a witness. Further, the Court notes that Chernis' testi-

mony regarding the nature of the Suisse Buillion business and the forgery was inconsistent.

Chernis testified that Lowy dissolved their partnership because he was unhappy with Chernis' mishandling of the Falkowitz situation and because Chernis' litigation practice was a drain on the firm's financial resources. Tr. 520–21, 538. Lowy testified that there were many reasons that he dissolved the partnership and that he notified Chernis of all of them at the time of dissolution. Tr. 1081–82. Lowy testified that Chernis had received bar association complaints; failed to respond to client requests; mishandled litigation matters; had outstanding tax liens; had personal judgments against him; fraudulently placed unemployed relatives on the firm's health insurance plan; and improperly obligated the firm on his BMW lease. Tr. 1081–82. Lowy testified that he notified Chernis of all of these reasons at the time that he decided to dissolve their partnership. Tr. 1080–86. Lowy's testimony was corroborated with documentary evidence (Ex. FN, FP, FQ, FR, FS, FT, FU) including the letter that he wrote to Chernis at the time of the dissolution, addressing each of these issues. Ex. DQ. Although the particular issues raised are generally irrelevant to the matter at hand, it does appear to the Court that there is reason to credit Lowy's version of these facts and to doubt the veracity of Chernis' testimony. Evaluating the evidence as a whole, the Court finds that Lowy's account is more credible and that Chernis' testimony is not trustworthy.

Chernis' testimony that he believed Suisse Bullion to be a "sham" (Tr. 515–16), and presumably the implication that Lowy knew the same, is contradicted by Lowy's testimony that he believed Suisse Bullion to be a legitimate company, at least until learning of Falkowitz' indictment in 1992.

Tr. 1065–66. Further, Chernis' testimony is contradicted by his own prior inconsistent testimony, in an affidavit provided to the SEC, in which he testified that he believed Suisse Buillion to have substantial revenues and that he had seen audited financial records of the company. Tr. 534–38; Ex. FE. Again, given the inconsistencies in, and the general untrustworthiness of, Chernis' testimony, the Court cannot find that the evidence establishes that Lowy knew, at the time of the 1991 transactions, that Suisse Buillion was not a legitimate, profitable business.

Chernis also testified that, as of 1990, he knew, and discussed with Lowy, that Falkowitz had forged the document. Tr. 515–16, 1086. Lowy testified that although he had suspected Falkowitz of the forgery, he did not learn that it was true until much later, after the 1991 transactions. Tr. 1086, 1090–92, 1145. Falkowitz also testified that he did not confess to the forgery until sometime after 1990. Tr. 608–10, 578–79. The evidence on this issue is much less clear. However, given the general untrustworthiness of Chernis' testimony, the Court finds that, without some additional evidence, it has not been established that Lowy knew that Falkowitz had forged the document prior to the 1991 transactions.

The evidence also established that Falkowitz had a drug and alcohol abuse problem for nearly 25 years and that Lowy knew about this sometime after 1990. Tr. 564–65, 579, 1091–93. The evidence also established that Falkowitz completed a rehabilitation program in 1990 and that Lowy was aware of that. Tr. 564–65, 1091–93.

Finally, the evidence established that Falkowitz was indicted in 1991 for conspiracy to defraud through false pretenses regarding the assets of Suisse Bullion. Tr. 572–78, 644–46. Although the evidence was not clear regarding the timing of the indictment, Falkowitz testified that it was "during the last quarter" of 1991 and the SEC suggests that it was July 1991. Tr. 575–78. Falkowitz' testimony is also not clear as to when Lowy learned of the indictment, although he seems to imply that Lowy learned of it during the last quarter of 1991. Tr. 575–78. Lowy testified that he learned of the indictment in the spring of 1992. Tr. 1094–95. Lowy and Glasband further testified that Lowy notified Glasband of the indictment and insisted that Falkowitz resign from SAMI. Tr. 339–40, 391–92, 394–95, 1094–95, 1098–99; Ex. 64, 65. The Court finds that because the evidence presented by the SEC was unclear and because the evidence of Lowy's actions in the spring of 1992 seem to corroborate his testimony, the evidence does not support a finding that Lowy knew of Falkowitz' indictment prior to the spring of 1992, when he and Glasband asked Falkowitz to resign from SAMI.

Falkowitz resigned from SAMI on April 6, 1992 and had no further involvement with the company. Tr. 1099–1100. In May 1992, Lowy learned that Falkowitz had pled guilty to the charges against him. Tr. 1099–1100; Ex. 59; Joint Stipulations 7. Although Falkowitz testified that he believed Novo Horizonte to be a valuable property at the time he sold it to SAMI (Tr. 633–34), the Court did not find that testimony persuasive. However, no evidence was presented that supports a finding that Lowy knew, at any time, that Novo Horizonte was not a valuable property. Tr. 1065.

***The Deeds and Appraisals***

In January 1992, Moura provided SAMI with deeds and appraisals for the four Brazilian Plantations. Tr. 1101, 1254. Lowy reviewed the deeds to confirm Moura's representations that SAMI was

the grantee and that the Plantations were unencumbered. He also noted that the deeds were formal documents with notarized signatures. Tr. 1101–03. Glasband also reviewed the deeds and he, too, was satisfied with their content. Tr. 306, 308–09, 387–89. Lowy and Glasband also reviewed the appraisals and were satisfied that they confirmed the values represented by Moura and Falkowitz and that no encumbrances appeared. Tr. 306, 308–09, 387–89, 1101–03. A variety of other individuals, including accountants and attorneys, subsequently reviewed the deeds and appraisals, and no evidence was presented to indicate that anyone had concerns that they were not bona fide.

Lowy received several letters from the Mouras threatening to cancel the deeds and/or indicating that the deeds had been cancelled. Ex. 83, 84, 85, 86, 91, 92; Tr. 1129–30. The letters each demanded that Moura be paid additional monies, did not indicate any authority to unilaterally cancel the deeds and were inconsistent in stating whether the deeds had in fact been cancelled. Ex. 83, 84, 85, 86, 91, 92; Tr. 1129–30. Lowy reviewed these letters and shared them with Glasband and other members of SAMI management. Tr. 404–05, 437, 593, 1155–1156. Eventually, Lowy and Glasband confronted Moura and demanded that he sign an agreement affirming that SAMI was the owner of record of the Plantations and that the deeds had not in fact been "cancelled". Tr. 1158–59; Ex. 88.

Lowy contacted the Brazilian bank that prepared the appraisals, Banco de Amazonia, S.A. ("BASA" or the "Bank"), by fax dated March 13, 1992 and addressed to Juvencio Vergolino Dias or Mario Macedo Bringel, seeking to contact the appraisers who prepared the Plantation appraisals. Tr. 1134; Ex. Z. The evidence did not establish that Lowy ever heard from Mr. Dias or Mr. Bringel. On March 27, 1992 (as evidenced by the fax transmittal report), Lowy received a fax stating that the appraisals that SAMI had, purportedly issued by BASA, were forged and fraudulent. Ex. 221. The fax is undated, is not on letterhead of any kind, and is signed by Luiz Benedito Varella, an apparent misspelling of the signature on the appraisals. Ex. 221. The appraisals were signed by a Luiz Benedito Varella and the two signatures do not look similar. Tr. 1137, 1346, Ex. 167. In fact, the fax was accurate, the appraisals were forged and fraudulent and the second signatory on the appraisals, Jose Ronaldo Pires Teixeira, was paid for his signature by Anotino Queiroz. Ex. 224, 235.

In response to the fax, Lowy circulated the fax to SAMI management and he and Glasband contacted Moura. Tr. 395–96, 451–52, 1133–34, 1137–38, 1344–45. Moura and his sister Vera Moura provided the explanation that the appraiser was angry at not having been paid and that the appraisals were indeed authentic. Tr. 318–19, 395–96, 451–53, 1137–38, 1148. The Mouras stated that they would resolve the problem with the appraiser and would provide Lowy with the contact information for Hamilton Gualberto, who they identified as a BASA lawyer, so that SAMI could get verification that the appraisals were authentic. Tr. 1138, 1412; Ex. BW.

Lowy and Glasband contacted Gualberto and received oral confirmation that the appraisals were valid and accurate. Tr. 396–98, 1138–40; Ex. BW. At Lowy's insistence, Gualberto sent written confirmation of his assurances by letter dated May 13, 1992. Tr. 398–99, 1139–40; Ex. AB, Q. Next, Lowy insisted on obtaining a second set of appraisals from an appraiser not associated with BASA. Tr. 321–22, 399, 1138–41, 1146, 1148; Ex. P. A second set of appraisals were provided to SAMI from

the firm Sindicato dos Engenheiros no Estado do Para. Ex. Y. Lowy testified that he and Glasband had approved the qualifications of the firm and that he believed the firm to be qualified and independent. Tr. 1149. Lowy and Glasband reviewed the second set of appraisals and were satisfied that the appraisals were sufficiently similar to lend support to their accuracy. Tr. 319, 322, 401, 1149–50.

SAMI also received a second set of deeds confirming their ownership of the Brazilian Plantations. 1150–51. Having reviewed the second set of deeds, Glasband noticed an encumbrance on the Novo Horizonte deed. Tr. 319–20, 488–89, 1151. Glasband notified Lowy and wrote a letter to Vera Moura to inquire about the apparent problem. Tr. 403–04; Ex. Q. The Mouras advised Glasband and Lowy that the encumbrance had been removed (Tr. 403–04) and Glasband testified that he believed that the encumbrance was removed. Tr.403. No evidence was presented that proved whether or not the encumbrance actually had been removed.

### Legal Opinions

In the summer of 1992, Manny Silverman, a potential investor in SAMI, visited two of the Brazilian Plantations. Tr. 389–91, 1178–81. While in Brazil, he consulted a Brazilian attorney, Michael Michahelles ("Michahelles"), and asked him to review the deeds and appraisals. Tr. 1178. In July 1992, Michahelles sent SAMI a letter containing his legal opinion regarding the documents. Ex. 255. The letter stated that the Brazilian Constitution and laws limit acquisition and development of agricultural land by foreign nationals. Ex. 255. Lowy testified that he did not interpret the letter to say that foreign nationals could not acquire agricultural lands, but simply that SAMI may need to receive some approvals before developing the Plantations. Tr. 1179, 1288–90.

It is unclear whether Glasband was aware of the Michahelles letter. Lowy testified that he shared it with Mr. Glasband (Tr. 1179) but Glasband testified that he was not aware of an opinion from a Brazilian lawyer casting doubt on SAMI's ownership of the Plantations and did not recall whether he had seen a letter to that effect. Tr. 336. Lowy did contact Vera Moura and request that she respond to the Michahelles letter. Tr. 1180. Vera Moura responded by letter that the Michahelles opinion letter was accurate and that Brazilian law did restrict SAMI's ability to own and/or develop the Plantations. Ex. 91. Vera Moura previously had numerous communications with Lowy and SAMI and failed to address any of these restrictions prior to having received the Michahelles letter. Tr. 1182. In fact, SAMI had previously made the same inquiry (Ex. 63; Tr. 1182) and had not received an affirmative response.

Lowy advised that SAMI should obtain a title opinion prior to merging with a public company that would take into account any possible restrictions. Tr. 1182–33. In or around February 1993, when SAMI was exploring a possible merger with a public company, SAMI, through Glasband, obtained a legal opinion from a Brazilian real estate lawyer. Tr. 420–21, 1184–91.

In February 1993, SAMI received the legal opinion, signed by Wilson Brasil and Yoshiko Mori, two Brazilian lawyers, following their review of SAMI's deeds and appraisals. Tr. 421–22, 1184–85, 1189–90; Ex. L. The letter stated "SAMI is the record owner of and has valid title to" each of the Brazilian Plantations. Ex. L. The opinion letter also concluded that there "are no laws or regulations of any kind in Brazil or any state or local jurisdiction in Brazil which prohibit or restrict SAMI, a U.S. (Delaware) Corporation, from owning

and being the record owner of any of the properties" and that there are no restrictions regarding foreign ownership or development of Brazilian property. Ex. L.

Lowy later found out that Wilson Brasil was Moura's lawyer. Tr. 1187–88, 1361. This was not surprising to Lowy because it was his experience that in transactions of this type, the seller's lawyer is generally used to obtain a title opinion. Tr. 1186–88. Brasil threatened to withdraw his legal opinion, in 1995, long after the transactions had been completed, LARI's SEC filings had been made and the SEC investigation had been commenced. Tr. 1191–92. Brasil's threat to withdraw his opinion was accompanied by a demand for more money. Tr. 1191–92.

### SAMI/LARI Audit

Although SAMI had insisted that Moura provide documentation of his costs, Moura had failed to comply. Moura, in January 1992, had submitted documentation of his costs associated with the transfer of the properties to SAMI, not his acquisition or development costs. Tr. 1304–05, 1400–01; Ex. 139. On or about January 22, 1992, Lowy faxed a letter to Vera Moura demanding documentation of Moura's acquisition costs to be audited in compliance with applicable SEC accounting rules. Tr. 1116; Ex. 80, DF. Vera Moura responded to Lowy's demand by proposing a modification of the SAMI–Moura agreement to delete the requirement that Moura provide his costs. Tr. 1109, 1368; Ex. 81. Vera Moura claimed that Moura was having difficulty documenting the costs. Tr. 1109–10. Lowy rejected Vera Moura's proposal

and reiterated the need for Moura to supply his costs. Tr. 1110. From January through July 1992, Lowy continued to demand that Moura provide the documentation and Moura continued to promise that it would be provided. Tr. 1110, 1119–20, 1122; Ex. DG, G. Despite Lowy and SAMI's repeated attempts, Moura never supplied documentation of his costs. Tr. 1118–19, 1252, 1401.

In preparing to merge with a public company, SAMI sought an accounting firm to perform an audit and create audited financial records. In the absence of documentation of Moura's costs, SAMI was in need of an alternative method of properly valuing the Brazilian Plantations. In February 1992, Lowy arranged for himself, Glasband and Falkowitz to meet with two partners at Coopers & Lybrand, now Price Waterhouse Coopers ("Coopers"), Robert Fish and Jules Reich. Tr. 405–06, 461–63, 1253, 1307–08; Ex. CV, EI, EJ. At the meeting, Reich suggested an alternative method of valuing the Plantations, in the event that Moura failed to supply his costs. Tr. 1120–1122, 1309–10.[3] The method suggested, known as the preferred stock method, allowed SAMI to value the properties based on the value of preferred stock for which they were exchanged so long as the properties were worth at least that much. Tr. 1120–21, 1309, 406.

Following the meeting with Coopers, Lowy continued to pursue the possibility of obtaining documentation of Moura's acquisition and development costs. On March 2, 1992, Lowy contacted Bouchinas, Cam-

---

**3.** The SEC presented the testimony of Mr. Fish, presumably to refute Lowy's testimony that the alternative method of valuation was suggested by Reich and that the accountants concurred with the decision to utilize the alternative method. However, Mr. Fish's testimony was that he could not recall whether or not any of the events in question took place.

Tr. 1430–32, 1434, 1437–38. Mr. Fish did identify a letter that he wrote to Lowy acknowledging the meeting. Tr. 1429–33, 1439–40. Lowy's testimony was also corroborated by the testimony of Glasband as well as documentary evidence. Tr. 405–06, 461–63; Ex. CV, EI, EJ, 104.

pos & Claro ("Bouchinas"), a Brazilian accounting firm which had been working with Moura and Coopers to audit Moura's costs. Tr. 1111–13; Ex. DH. SAMI paid Bouchinas $20,000 to assist Moura with the documentation. Tr. 1113–14; Ex. DI. It was not until 1993, when Moura had still failed to provide his costs, that SAMI sought to restructure its deal with Moura to value the properties based on the liquidation value of preferred stock. Tr. 1124–26, 1401–02. Bouchinas would not be used to conduct the SAMI audit because they did not have experience with SEC auditing. Tr. 1115.

Because Coopers had expressed disinterest in conducting the SAMI audit, Glasband recommended that SAMI hire Sklar Heyman, an accounting firm with which he had worked, to prepare the audited financial statements. Tr. 1122–23, 406–09, 678, Ex. AM. In the summer of 1993, Lowy met with Howard Sklar and Dennis Klein ("Klein") from Sklar Heyman. Tr. 1170. Lowy testified that he understood that Sklar Heyman, and particularly Klein, had experience with conducting public audits. Tr. 1122–23. As such, Sklar Heyman was retained to conduct the SAMI audit. Ex. AM.

Klein, a partner at Sklar Heyman, was in charge of the SAMI audit. Tr. 723. Klein collected SAMI's accounting records. Tr. 652–54. Klein testified that Lowy did not restrict his firm's activities or his access to any documents at SAMI. Tr. 731–32, 735, 737–38. Lowy and Glasband produced summaries of SAMI's bank account records and Lowy provided a summary of SAMI related transactions from his escrow account. Tr. 653–54, 1240–42; Ex. 123, 138. Glasband ensured that Klein was provided with all relevant deeds, appraisals and financial information. Tr. 407, 730–31; Ex. AQ, AR. In addition to providing documents, Lowy was responsible for answering questions that Klein or Sklar Heyman posed in the course of the audit and to review drafts of the financial statements. Tr. 1170, 685–90, 694–95; Ex. 120, 121, 122, 128, 129, 130.

In July 1993, Sklar Heyman researched the suggestion of using the liquidation value of the stock to value the Plantations in the audited financial statements. Tr. 1123. Based on the Generally Accepted Accounting Principles ("GAAP") Guide, Klein concluded that the method was appropriate. Tr. 700–02, 740–41, 748–49, 1123–25; Ex. AN. Martin Ellis ("Ellis"), a future LARI director, suggested using a $5 million valuation based on the hard asset value of the land itself and its infrastructure, as set forth in the appraisals. Tr. 94–95, 1124, 1314–15; Ex. 139. Having reviewed all of the documents, and recognizing that Moura was accepting the $5 million compensation in an arms length transaction, Klein approved of the $5 million valuation. Tr. 740–41, 749–50.

Ultimately, with the concurrence of Sklar Heyman, through Klein, LARI's financial statements reflected the $5 million preferred stock valuation. Ex. 117; Joint Stipulations 9. Lowy, Glasband and Ellis each concurred that the valuation was not overstated and was conservative and that they understood the accounting firm to have performed professionally and in accordance with GAAP standards. Tr. 94–95, 124–26, 413, 497, 1174–75, 1314–15, 1171.

The SEC subsequently brought an action against Klein alleging inadequacies in the audits. Klein settled the action, although his testimony indicates he believed that he acted responsibly in the course of the audit. Tr. 723–24. Sklar Heyman also retained an outside consulting firm to conduct a quality review of the audit. The consulting firm concurred that the audit

had been conducted adequately. Tr. 723–24.

### Formation of LARI

SAMI formed a subsidiary called National Mining Corp. and transferred to it Peruvian Assets owned by SAMI. Tr. 1163–64. In October 1992, National Mining Corp. performed a reverse merger with Airline Software, Inc., a public company, and changed its name to Mining Corp. Tr. 1164, 1021–22; Joint Stipulations 4. The reverse merger agreement was signed by Glasband on behalf of National Mining Corp. Tr. 1022–23. As a result of the reverse merger, Mining Corp. was a public company. Subsequently, in July 1993, SAMI transferred its remaining assets, including the Brazilian Plantations, into Mining Corp. through a statutory merger. Tr. 1163–65; Ex. 33; Joint Stipulations 10. Mining Corp. changed its name to LARI. Tr. 1163–65; Ex. 33. After the merger, LARI's officers and directors consisted of Ellis, Mitchell Newman ("Newman"), Paul Cheek, Glasband and Moura. Tr. 1167.

Airline Software, Inc. was a Nevada public company controlled by Gordon Rosen ("Rosen"). Tr. 41–42, 1006. Rosen was Lowy's client who gave Lowy stock in Airline Software, Inc. as compensation for legal services. Tr. 1014–15, 1017; Ex. 9. Rosen, as a shareholder in Airline Software, Inc., became a shareholder in LARI through the reverse merger process. Tr. 1024–26. Rosen sold those shares to Lowy, Glasband and Newman for cash. Tr. 1025–26. The SEC called Rosen as a witness in an effort to discredit Lowy, particularly through allegations that Lowy had forged various documents with Rosen's signature on them. Tr. 46–52, 60–61, 66–72. The Court tended to disbelieve the testimony presented by Rosen and was particularly convinced by the testimony of Mary Schoonmaker, an impartial witness

for the defense, who testified that she had guaranteed, in his presence, some of the signatures that Rosen now claimed were forged. Tr. 990–93, 1002. The Court finds that Rosen's testimony is not credible and will not be credited in the finding of facts in this case.

### The Filings and Responses to SEC Inquiries

An Information Statement must be filed with the NASD before a brokerage firm may make a market for a publicly traded stock. Tr. 808. The brokerage firm is required to satisfy itself regarding the basis for and accuracy of the information contained therein and that it has no reason to believe the information is inaccurate. Tr. 808–09, 1334–36. Information Statements are not generally available to the public, but may be provided to investors in connection with a particular transaction. Tr. 846–49, 1192, 1337–38, 832–33. Lowy testified that he did not remember any investors being provided with the LARI Information Statement (Tr. 1411–12) and no other evidence was presented regarding this issue.

Ellis, LARI's Chairman, took primary responsibility for the Information Statement. Tr. 1363–64. Ellis also recommended that Neal Bruckman ("Bruckman") be retained to assist with LARI's Information Statement. Tr. 1193, 806–07. Bruckman had been convicted of mail fraud in November 1987 and Lowy was aware of Bruckman's conviction shortly after the beginning of their association. Tr. 805–07, 1194.

The Information Statement was made up of three sections: (a) risk factors; (b) LARI's business plan; and (c) LARI's financial statements. Ex. 1. The risk factors respond to thirteen categories of specified information. The business plan informs a broker-dealer of the risks associated with making a market in the compa-

ny. The financial statements included were those that Sklar Heyman had prepared. Tr. 808, 1195–97, 1369–70; Ex. 1.

Bruckman compiled the "risk factors" section of the Information Statement, after reviewing the deeds, appraisals and business plans that he received from Ellis. Tr. 807–08, 833–35, 1195, 1369–70. Bruckman verified the legitimacy of BASA by contacting a colleague at Credit Suisse with extensive experience in Latin America. Tr. 811, 836. Drafts of the section were distributed for comment to Lowy, Glasband and Ellis. Tr. 837, 839–40; Ex. 149, 150, 151, 152, 155, 156, 157, 158. Lowy reviewed the drafts and discussed them with Bruckman. Tr. 817–18, 1197–98, 1373; Ex. 149, 150, 151, 152, 155, 156, 157, 158. Ellis prepared, and Bruckman reviewed, the business plan section of the Information Statement. Tr. 807, 841, 1196, 1369–70.

When the drafts were complete, Lowy, as LARI's counsel, drafted a cover letter and forwarded the Information Statement to M. Rimson & Co., Inc. ("Rimson"), the broker-dealer. Tr. 1197. The Information Statement and cover letter were reviewed and approved by Ellis, Glasband and Bruckman. Tr. 845, 847, 95–96, 120–21. Ellis, as LARI's Chairman, signed the Information Statement (Ex. 1), and it was filed with the NASD in November 1993 by Rimson. Tr. 840, 1374; Ex. 1; Joint Stipulations 11.

As is customary in the approval process, the NASD sent comment letters to Rimson concerning the Information Statement. Tr. 1198; Ex. 205, 210, 212. Also as is customary, those comments were sent to LARI for response. Tr. 1198, 1417–18. Ellis and Lowy coordinated the responses to the NASD comments and provided additional information. Tr. 96–97, 1198, 1375, 1417; Ex. 161, 210A, 212A; Joint Stipulations 12. Lowy also provided the NASD with the deeds and appraisals and the auditors responded to questions regarding the accounting methodology used. Tr. 690–92, 1199–1200, 1201–03; Ex. 125, 207, 210A; Joint Stipulations 12.

On July 15, 1994, LARI filed a Registration Statement with the SEC, at the insistence of a group of investors. Tr. 1203–04; Ex.2; Joint Stipulations 13. Also at the insistence of those investors, LARI hired the law firm of Alex Bienenstock ("Bienenstock") to prepare the filing. Tr. 424–27, 1203–04; Ex. FD. The Bienenstock firm was retained in April 1994. Ex. FD. Bienenstock was the former chief of the SEC's Branch of Small Issues. Tr. 1204, 769–770. In addition to Bienenstock, Sorrel Danilowitz ("Danilowitz"), a sole practitioner and independent contractor of LARI, worked on the Registration Statement. Tr. 1353, 1418–19, 1207–1208. Danilowitz prepared initial drafts for Bienenstock's review. Tr. 776–77, 771; Ex. 194. Finally, at the suggestion of Glasband, who was unsatisfied with Danilowitz' work on the Registration Statement, Richard Feiner ("Feiner"), an associate at Lowy's firm, also worked on the Registration Statement. Tr. 425, 1353–54, 1418–20, 1209.

Danilowitz and Feiner worked together to create a number of drafts which were reviewed by Bienenstock and his partner, Bill Singer. Tr. 771–72, 1208–09. Danilowitz, Feiner and Bienenstock all had access to LARI's records, including the deeds and appraisals of the Plantations. Tr. 1209–10, 1212. Bienenstock's testimony was that he could not recall whether he had reviewed the deeds and appraisals. Tr. 779, 793, 802–03. Although the drafts were created on the Lowy law firm word processing system (Ex. 180, 182, 183, 184, 185, 186, 187, 188, 190, 191), no evidence was presented that proves whether or not Lowy himself worked on those drafts.

Lowy's testimony was that he did not participate in drafting the Registration Statement. Tr. 1004–05, 1210, 1211–12. Indeed, none of the drafts submitted into evidence were shown to contain notes or edits by Lowy. Tr. 1216–20.

Bienenstock's testimony was curious in many respects. He testified that he did not conduct due diligence in reviewing the Registration Statement and he believed that the due diligence was the responsibility of the Lowy law firm. Tr. 773–75. He testified that he was not responsible for drafting the Registration Statement, only for reviewing it. Tr. 770–71. However, the retention agreement signed by LARI and the Bienenstock firm stated that the Bienenstock firm was to "prepar[e] a Form 10 Registration Statement," and that "The Law Firm [would] also review ... corporate books and records and any and all corporate documents ...." Ex. FD. Further, Bienenstock's testified that his understanding of his role in the preparation of the Registration Statement came from conversations with Mr. Singer, not with Lowy. Tr. 770–71, 775. Finally, Bienenstock testified that he had access to all of the LARI documents, reviewed them and believed that the Registration Statement was accurate when completed. Tr. 802–03. Lowy's testimony was that he believed that the Bienenstock firm was to conduct the necessary due diligence and draft the Registration Statement. Tr. 1206–07. The Court finds that the evidence is unclear as to what role Bienenstock was meant to play in the drafting of the Registration Statement, what role he actually did play and what role, if any, Lowy played in the drafting of the Registration Statement. However, it was not established, by a preponderance of the evidence, that Lowy knew, or should have known, that the Bienenstock firm was not conducting the necessary due diligence and drafting the Registration Statement. The

evidence also did not establish that Lowy was unreasonable in believing that the Bienenstock firm had done the due diligence and drafting.

In any event, the final draft of the Registration Statement was reviewed and approved by Glasband and Newman, who signed the form on behalf of LARI. Tr. 427,–28, 1212; Ex. 2. The Registration Statement was filed with the SEC on July 14, 1994 by Bienenstock and the SEC provided a comment letter to Newman and a copy to Bienenstock. Tr. 1376–77, 772–74; Ex. 195, 198; Joint Stipulations 13.

Both the Information Statement and the Registration Statement, as well as the responses to the NASD inquiries, contained statements regarding LARI's assets, including the Brazilian Plantations. The statements made were that LARI had acquired title to the four Plantations free and clear with no encumbrances and that the value of LARI's assets was in excess of $5 Million. The statements also included the size and location of each of the Plantations. The SEC asserts that each of these statements were misrepresentations.

### Ownership of the Brazilian Plantations

Contradictory evidence was presented at trial regarding whether or not LARI ever owned the Brazilian Plantations. The SEC presented the testimony of Dr. Carlos Maximiano Mafra de Laet ("Laet"), an expert in Brazilian real estate law, who opined that LARI did not acquire title to any plantations in Brazil because SAMI was not authorized to do business or purchase rural property in Brazil. Tr. 146–53, 161, 222–23. Lowy presented the testimony of Alberto Murray Neto ("Murray"), an expert in Brazilian real estate law, who opined that SAMI owned the properties and continued to be the record owner of the Brazilian Plantations at the time of trial. Tr. 944–49. Having reviewed all of

the evidence presented, the Court finds that the evidence presented by both sides was compelling and reliable. This Court need not and will not reach the issue of whether SAMI or LARI owned the Brazilian Plantations because the SEC's case fails as a matter of law because of the inability to establish scienter.

### Value of the Brazilian Plantations

The evidence presented regarding the value of the Brazilian Plantations was also unclear. The SEC presented the testimony of Thomas Govier ("Govier"), an appraiser who testified as to his appraisals of the Brazilian Plantations. Tr. 226–79. The testimony established that Govier's appraisal of the properties, excluding any value attributable to the timber and other vegetation, was nearly $3 million. Tr. 275–76, 291. As such, the SEC did not present evidence that the Plantations were without any value and did not establish, by a preponderance of the evidence, that the value of LARI's assets, considered as a whole, equaled $5 million. Further, even if the SEC had presented evidence that the properties appraised by Govier were not properly valued at $5 million, the evidence did not clearly establish that Govier appraised the lands that were the subject of LARI's claimed assets. Tr. 243, 246–48, 258–59, 267, 283–84, 286–87, 293. Again, this Court need not and will not reach the issue of whether the Brazilian Plantations were properly valued because the SEC's case fails as a matter of law because of the inability to establish scienter.

### CONCLUSIONS OF LAW

As the Plaintiff in this civil action, the SEC bears the burden of proving, by a preponderance of the evidence, each of the elements of the alleged causes of action. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 387–88, 103 S.Ct. 683, 690, 74 L.Ed.2d 548, 559 (1983). The

first two counts alleged are for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.15c2–11 ("Rule 10b–5"). In order to prevail on these counts, the SEC must establish (1) that Lowy made, directly or indirectly, one or more misrepresentations or omissions; (2) in connection with the purchase or sale of a security; (3) that were material; (4) and involved interstate commerce; (5) and that Lowy acted with scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1385, 47 L.Ed.2d 668, 681 (1976). The third count alleged is for violation of Rule 13b2–1, 17 C.F.R § 240.13b2–1 ("Rule 13b2–1"). In order to prevail on the third count, the SEC must establish that Lowy directly or indirectly, falsified or caused to be falsified, any book, record or account that the company was required to maintain under the Securities Exchange Act. *See* 17 C.F.R § 240.13b2–1.

A. Count I: Did Lowy violate Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 by making misleading representations in LARI's Information Statement or by making misleading representations in LARI's responses to questions raised by the NASD in their review of the Information Statement?

1. Did Lowy make, directly or indirectly, any misrepresentations in either the Information Statement or the responses to questions raised by the NASD?

As discussed above, the Court will not reach the issue of whether or not the statements made about the ownership and/or value of the Brazilian Plantations were misrepresentations. Instead, for the purpose of this discussion, the Court will

assume that the statements were misrepresentations. The remaining issue therefore is whether Lowy made any of those statements, such that he can be held liable for them under Rule 10b–5.

The Supreme Court, in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), held that 10b–5 does not proscribe "giving aid to a person who commits a manipulative or deceptive act." *Id.* at 177–78, 114 S.Ct. at 1448, 128 L.Ed.2d at 132. Lowy contends that he was merely a secondary actor, a counselor to LARI, and that he did not himself make any of the alleged misleading statements. Accordingly, Lowy contends that, under *Central Bank,* he cannot be held liable under 10b–5.

The Second Circuit has interpreted *Central Bank* strictly and endeavored to develop a "bright line" approach to 10b–5 liability. The Second Circuit explains that anything less than actually making the misrepresentation is mere aiding and abetting and does not support 10b–5 liability. *See Shapiro v. Cantor,* 123 F.3d 717, 720 (2d Cir.1997) ("If Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."). *See also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 843 (2d Cir.1998).

The SEC cites a number of pre-*Central Bank* cases for the proposition that Lowy can be held liable under 10b–5. These cases are unhelpful. Whether Lowy can be liable under 10b–5 turns on whether he made any of the statements in question and must be decided in the context of post-*Central Bank* case law.

This is a close case. The evidence established that Lowy was neither a director nor an officer of LARI and that he did not control the books and records of LARI. Tr. 331, 1166–67. The evidence also established that Lowy did not alone draft any of the statements in question. However, the evidence also established that the statements in question here did not originate with LARI, but with the predecessor companies and with Lowy himself. Lowy was directly involved in allegedly acquiring the Plantations for the company and in obtaining the appraisals. Tr. 1054–55, 1057, 1060–63, 1064–65, 1101–03, 1138–40, 1149–50. Lowy maintained the corporate records of the predecessor companies (Tr. 327–29) and the statements in question originated at that time. Although Lowy did not himself place the statements in the filings or the responses to the NASD questions, he provided the substance of the statements and he was in a good position to verify their veracity.

As this case does not turn on this issue, the Court will not determine whether or not Lowy can be said to have made the statements, such that liability under 10b–5 could be imposed.

2. Did Lowy make misrepresentations that were in connection with the purchase or sale of a security?

The representations were without question in connection with the purchase or sale of LARI securities. The statements regarding the ownership and value of the Plantations were made in an effort to attract investors at the point that LARI went public. In fact, Lowy does not contest this element. Assuming for the purpose of this discussion that the representations were misleading and made by Lowy, this element has been established.

3. Did Lowy make misrepresentations that were material?

A misrepresentation is material, for the purpose of a 10b–5 analysis, when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 766 (1976). The Court finds that the statements involved were material. The value of the Brazilian Plantations constituted the vast majority of LARI's assets. There is no question, and indeed, it does not appear to be disputed by Lowy, that the representations in question were material. As such, assuming for the purpose of this discussion that the representations were misleading and that Lowy made them, this element has been established.

4. Did Lowy make misrepresentations that involved interstate commerce?

The statements in question were made in connection with a security to be traded on the NASD over-the-counter market. As such, assuming for the purpose of this discussion that the representations were misleading and made by Lowy, this element has been established.

5. Did Lowy act with scienter?

In the context of a 10b–5 action, scienter means "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976); *see also Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001); *In re Scholastic Corporation Securities Litigation,* 252 F.3d 63, 76 (2d Cir.2001). The Supreme Court has expressly held that mere negligence will not support liability under Rule 10b–5. *See Ernst & Ernst,* 425 U.S. at

193, 96 S.Ct. at 1381, 47 L.Ed.2d 668 (holding that negligence alone is insufficient for civil liability under 10b–5 and instead that some level of scienter-"intent to deceive, manipulate or defraud" is required). The Supreme Court has, however, left open the issue of whether or not recklessness will suffice to support 10b–5 liability. The law in this Circuit firmly establishes that recklessness is indeed sufficient to support 10b–5 liability. *See In re Scholastic,* 252 F.3d at 76; *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 46 (2d Cir.1978) ("[I]t is consistent with, if not demanded by, precedent in this circuit to hold that reckless conduct satisfies the scienter requirement."); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1301 (2d Cir.1973); *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 268–69 (2d Cir.1996). As such, the SEC has the burden of establishing, by a preponderance of the evidence, that Lowy acted at least recklessly in making the misleading representations, in order for 10b–5 liability to attach.

■ "To qualify as reckless conduct, [Lowy's] conduct must have been 'highly unreasonable' and 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to [Lowy] or so obvious that [he] must have been aware of it.' " *In re Scholastic,* 252 F.3d at 76 (quoting *Rolf,* 570 F.2d at 47). This rather inexact standard of conduct has been applied to a variety of fact patterns and courts have enunciated various patterns of behavior which could be classified as reckless. The *Rolf* court held that "[a] refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, . . ." would qualify as reckless conduct and that "representations and opinions . . . given without basis and in reckless disregard of their truth or falsity" establish scienter under 10b–5. *Rolf,* 570 F.2d at 46 n. 13, 48. The SEC points the

Court to *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000), in which the Second Circuit held that recklessness was established where the defendant "failed to review or check information that [he] had a duty to monitor, or ignored obvious signs of fraud." *Id.* at 308. *See also Chill,* 101 F.3d at 268–70 (citing to various cases for the proposition that the standard of recklessness is high and holding that the supposed "red flags" set forth by the SEC did not amount to recklessness where defendant did not investigate record-high profits for evidence of fraud); *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness."); *SEC v. Bremont,* 954 F.Supp. 726, 730 (S.D.N.Y.1997) (holding that recklessness would be established where defendant failed to "make the slightest attempt to verify" the fraudulent information).

Applying these standards and having objectively evaluated the evidence as presented at trial, the Court finds that the SEC has failed to prove, by a preponderance of the evidence, that Lowy acted recklessly in disseminating any of the allegedly fraudulent statements. Although the SEC claims that a number of "red flags" existed which tend to prove either that Lowy knew that he was making false statements or that he recklessly failed to discover the falsity of the statements, the Court finds that Lowy in fact responded reasonably to and investigated each of the supposed "red flags", that he did not "ignore obvious signs of fraud" and that the SEC has not shown that his conduct amounted to "an extreme departure from the standards of ordinary care." Accordingly, even if the Court were to find that the SEC had established, by a preponderance of the evidence, that Lowy made misleading representations, the failure to establish that he acted with scienter precludes the imposition of liability under 10b–5.

### Threats from Moura

■ The SEC presents as evidence the fact that Lowy received several letters from Moura and his sister threatening and actually telling him that the Plantation deeds and appraisals were cancelled. The SEC asserts that these letters should have alerted Lowy to the fact that LARI did not have good title to the Plantations. The Court rejects this assertion. There is no question that Lowy received threatening letters from Moura and his sister, the letters were accepted into evidence and Lowy himself testified to having received them. Ex 83, 84, 85, 86, 91, 92; Tr. 1129–30. However, having reviewed the letters themselves and evaluated Lowy's testimony as to his reaction to them, the Court finds that the evidence of the letters does not tend to prove recklessness on Lowy's part.

Initially, the Court notes that a review of the substance of the letters reveals that they are not of a nature that would be likely to concern most reasonable business people. The letters each state that the deeds either would be cancelled or had been cancelled and purport to cancel the agreement signed by SAMI and Moura. Tr. 1129–30; Ex. 83, 84, 85, 86, 91, 92. The letters do not offer any support for the implication that Moura would have the power to unilaterally cancel a contract entered into between the parties or unilaterally "cancel" a deed that had been executed in favor of SAMI. A reasonable business person would likely not credit an unsupported threat of that nature. Indeed a business person could reasonably interpret the letters as empty threats. Moreover, the letters themselves are inconsistent and thereby reveal that

no action had been taken to cancel the agreements or the deeds, as threatened. For instance, on March 10 and 11, 1992, Moura stated that the agreements and deeds had been cancelled (Ex. 83 and 84) but then on June 22, 1992, Moura stated that "all assets are in name of SAMI." Ex. 86. These internal inconsistencies only further support the conclusion that these letters amounted to empty threats that may have been reasonably disregarded by a business person.

The Court notes that although the letters themselves do not amount to evidence that would establish recklessness on Lowy's part, even had he disregarded them as empty threats, the evidence in fact established that Lowy took steps to respond to them. Tr. 344–46, 404–05, 593, 1155–56. Lowy testified that he shared the letters with a number of interested parties, including lawyers who worked on the company's filings and auditors, and that other members of management were supplied with, or were otherwise aware of, the letters. Tr. 1156. The testimony of Glasband and Falkowitz corroborated Lowy's testimony. Tr. 404, 593. Further, Lowy and Glasband confronted Moura to confirm that title to the properties had been passed to SAMI and required Moura to confirm that fact in writing. Tr. 404–05, 436–37; Ex. 88. Moura signed an agreement, on June 29, 1992, also signed by Lowy on behalf of SAMI, which confirmed, "SAMI continues to own and will continue to own all of the Assets as defined in the [December 18, 1991] Agreement." Ex. 88. After evaluating the threats, confronting Moura and obtaining written assurance that title had passed, SAMI's management was understandably satisfied that SAMI was the record owner of the Plantations.

### Fax from Varella

The SEC also presents as evidence of recklessness a facsimile sent to Lowy, purportedly from BASA, stating that the appraisals were false and that the signature on the appraisals was forged. Ex. 221. The SEC asserts that this fax should have alerted Lowy to the fact that the appraisals of the Plantations were fraudulent and that his failure to discover the proper valuations of the Plantations thereafter was reckless. The Court rejects this argument. Although the fax itself would certainly qualify as a "red flag," the Court finds that Lowy's response to the fax was reasonable and that his ultimate statements about the valuation of the Plantations were not reckless based on his receipt of this fax.

Initially, the Court notes that the substance of this fax could qualify as a "red flag" and that deliberate indifference on Lowy's part could have amounted to recklessness. However, the Court also notes that having evaluated the fax, it is not as persuasive as the SEC now asserts. In fact, the fax itself was not sent on Bank letterhead and is not in any other way identified as a Bank communication. Further, the name printed beneath the signature line on the fax, Varella, (Ex. 221) appears to be a misspelling of the name Varella which appears on other communications involving the Bank, including the appraisals. Ex. 225 Attachment 5, 6. *See also* Tr. 1137. Accordingly, the Court finds that a reasonable business person would have reason to doubt the authenticity of this fax and while it would certainly be negligent to ignore a fax of this substance, it is much more difficult to evaluate whether it would have been reckless.

It is unnecessary to evaluate whether deliberately ignoring the fax amounted to reckless conduct because the evidence presented established that Lowy did in fact respond to the fax and ultimately was satisfied that the fax was not credible. Tr. 318–19, 321–22, 395–99, 451–52, 1344–47,

1137–48. The Court finds that Lowy's actions in this regard were reasonable and that the evidence presented failed to prove, by a preponderance of the evidence, Lowy's recklessness. Lowy testified that he circulated the fax to SAMI management and that he and Mr. Glasband discussed it with Moura. Tr. 1137–38, 1344–47. Again, Lowy's testimony is corroborated by Mr. Glasband. Tr. 318–19, 395–99, 451–52. Lowy received an explanation for the fax from Moura and insisted that Moura provide him with further assurance that the Bank appraisals were valid and accurate, in the form of an opinion letter from the Bank's lawyer. Tr. 395–96, 1138, 1345–47. Lowy received contact information for the Bank Attorney, Gualberto, from Moura and he contacted Gualberto personally. Ex. BW, Tr. 1138–40. Lowy received a letter from Gualberto, purportedly on behalf of the Bank, attesting to the validity and accuracy of the appraisals. Tr. 1140–42; Ex. AB, Q. Even after having received verification of the appraisals from Gualberto, Lowy insisted that the Mouras' provide him with a second set of appraisals from an independent source. Tr. 1138, 1146, 1148–1150. After receiving a second set of appraisals from an independent firm, believed to be reputable, and which were substantially similar to the first set of appraisals, Lowy was understandably satisfied that the appraisals were valid and accurate. The Court finds that the totality of Lowy's actions in response to the fax do not amount to a showing of recklessness.

The SEC repeatedly questioned Lowy regarding why he did not attempt to contact the sender of the fax via the telephone number printed on the fax. Tr. 1344–1347. Presumably, the SEC would have the Court draw the conclusion that Lowy's failure to make that telephone call equals recklessness on his part. The Court rejects that conclusion. While making the telephone call may have been a more prudent course of action and although it now appears, through hindsight, that the telephone call may have provided Lowy with invaluable information regarding the valuation of the Brazilian Plantations, none of this amounts to recklessness on Lowy's part. In fact, Lowy did proceed in a reasonable fashion, particularly considering that he did not have the benefit of hindsight that the Court and the SEC have now.

### Authorization of SAMI to acquire property in Brazil

■ The SEC presented evidence that Brazilian law requires a foreign company to obtain prior authorization by the Brazilian Agricultural Ministry before acquiring agricultural property and that therefore, SAMI, which did not have such authorization, could not be the owner of the Brazilian Plantations. Tr. 146–53, 161, 222–23. Further, the SEC asserts that Lowy had reason to know of this requirement (Ex. 255; Tr. 1178) and that his failure to realize the requirement and recognize that SAMI was not therefore the owner of the Plantations, was reckless and supports 10b–5 liability. As noted above, the Court finds that the SEC has presented compelling evidence that SAMI was not authorized, under Brazilian law, to own the Plantations, and therefore did not own them. However, as also noted above, the evidence to the contrary presented by the Defendant was also compelling and it is difficult to determine whether the SEC met its burden of proof on that issue. The Court finds that it is unnecessary to make that determination because, even assuming that the SEC has established that SAMI could not have owned the Plantations under Brazilian law, the SEC has failed to establish, by a preponderance of the evidence, that Lowy was reckless in believing that SAMI had good title to the Plantations.

Lowy testified that he received a letter from a Brazilian attorney, Mr. Michahelles, that indicated that there may have been some restrictions on SAMI's ability to own the Brazilian Plantations. Tr. 1178. In fact, the letter stated that "[t]he Brazilian Constitution of 1988 determines in Chapter 190 that the acquisition of agricultural properties by foreign individuals or corporations shall be governed by law.... Basically, these acquisitions are limited to certain land sizes or to obtaining prior authorization by the Brazilian Agriculture Ministry...." Ex. 255. Similar to the fax discussed above, had Lowy neglected to respond to this letter in any way, it may well have amounted to recklessness. However, the Court finds that Lowy's response to this letter, as established by the evidence presented at trial, was reasonable under the circumstances and does not support a finding of recklessness on his part.

It is important to consider the letter from Michahelles in the context of SAMI's business plan at the time it was received. Lowy testified that at the time the letter was received, the main focus of SAMI's business efforts was in Mexico and SAMI was not in a position to become a publicly traded company in the immediate future. Tr. 1183–84. Lowy's testimony was not controverted by any evidence presented by the SEC. As a result of the state of SAMI's business at the time the letter was received, it was not crucial that Lowy obtain a legal opinion as to the ownership of the Brazilian Plantations at that time. Further, Lowy testified that if he was aware that it was necessary to establish a Brazilian company or obtain an authorization for SAMI to own property in Brazil, he could easily have complied with those requirements because he had experience with such restrictions from prior business deals in other countries. Tr. 1183–84. This testimony is supported by Glasband (Tr. 367–68) and not controverted by any evidence presented by the SEC. Given the context of Lowy's receipt of the letter, as established by the evidence, the Court finds that Lowy's reaction to the letter was reasonable.

Upon receipt of Michahelles' letter, Lowy confronted Vera Moura, who was not only a Brazilian attorney but also had been involved in the structuring of the deal from the beginning, to determine whether she was aware of any restrictions on SAMI's ability to own the Plantations. Tr. 1179–80. Surprisingly, Vera Moura responded to Lowy's inquiry in the affirmative. Tr. 1181–83; Ex. 91. Vera Moura's response was surprising because SAMI had previously made the same inquiry (Ex. 63; Tr. 1182) and had not received an affirmative response. Tr. 1182[4]. Understandably, Lowy had some doubts as to the trustworthiness of Vera Moura's belated revelations in this matter and, accordingly, sought out a legal opinion from another Brazilian lawyer. Tr. 1184–92; Ex. L. Lowy eventually did obtain a legal opinion from another Brazilian lawyer, in February 1993 when SAMI was much closer to merging into an entity that would go public. Tr. 1185. The legal opinion was obtained from Wilson Brasil and Yoshiko Mori, Brazilian lawyers who represented the Mouras. Tr. 1185–86. The legal opinion stated that "SAMI is the record owner of and has valid title to [the Brazilian Plantations].... There are no claims, liens, encumbrances, taxes, mortgages or charges of any kind or nature filed against any [sic] the properties.... There are no laws or regulations of any kind in Brazil or

---

4. Lowy's testimony is that he never received a response from the Moura's, prior to Mr. Michahelles' letter, indicating that Brazilian law placed any restrictions upon SAMI's ability to own the Plantations. The SEC has presented no evidence to refute this testimony.

any state or local jurisdiction in Brazil which prohibit or restrict SAMI, a U.S. (Delaware) Corporation, from owning and being hte [sic] record owner of any of the Properties...." Ex. L. Lowy reasonably relied upon this opinion, from Brazilian lawyers whom he believed to be reputable. Further, Lowy believed at all times that if this opinion turned out to be erroneous, the consequences would be minimal as he could easily form a Brazilian company to hold the title to the Plantations. Tr. 1183–84. As such, the Court finds that the totality of the circumstances and Lowy's reaction, as established by the evidence, relating to Michahelles' letter, fail to support a finding of recklessness.

Again, the SEC questioned Lowy regarding why he contacted Vera Moura instead of Michahelles in response to the Michahelles letter (Tr. 1290–91), presumably in an attempt to establish that Lowy's failure to contact Michahelles directly was itself reckless. The Court rejects that assertion. Again, while Lowy's course of conduct may not correlate with conduct preferred by the SEC and although it may not now, with the benefit of hindsight, appear to be the most prudent course of conduct, that does not establish that it was reckless at the time. Again, the Court finds that the totality of Lowy's actions regarding the Michahelles letter, particularly considering the surrounding circumstances, does not support a finding of recklessness.

The SEC also placed much significance on the fact that the opinion letter did not cite to specific statutes under Brazilian law and was not endorsed by a judge or consulate (Ex. L; Tr. 1300–03), as suggested in SAMI's January 30, 1992 letter. Ex. 63. Again, the Court rejects the assertion that these facts establish Lowy's recklessness. While a letter in the form suggested by the January 30, 1992 letter may have been

preferable and while it may have been ill-advised for Lowy to accept the letter as it was presented, the Court finds that it cannot be characterized as an extreme departure from the exercise of due care. First, it is somewhat counterintuitive to require a citation to a Brazilian statute to support the proposition that there is no Brazilian statute that limits SAMI's right to own the Plantations. Second, the January 30, 1997 letter did not require the signature of a judge or consulate, it merely stated that it would be preferred if possible. Ex. 63. And, ultimately, Lowy's reliance on the letter, even lacking citation to a statute or the signature of a judge or consulate, does not rise to the level of recklessness.

### Criminal Liability of Falkowitz and Bruckman

██ The SEC presented uncontroverted evidence that two of Lowy's associates, Falkowitz and Bruckman, had been involved with criminal activity in the past. Falkowitz had a 1985 conviction for fraud and conspiracy, which Lowy knew about, (Ex. 57; Tr. 561–63) and he was indicted in 1991, during his dealings with Lowy relating to the Plantations, for conspiracy to defraud. Tr. 572, 644; Ex. 58. Bruckman was convicted of federal mail fraud in November 1987 and Lowy seems to have known of this conviction shortly after the beginning of their association relating to the Plantations. Tr. 805–07, 1194. The SEC presents this evidence to support the contention that Lowy's willingness to involve these individuals in the development of LARI's business and to rely on their representations and efforts in making statements regarding the ownership and value of the Plantations to the NASD, the SEC and the investing public, was reckless. The Court rejects this assertion. Involving individuals who have had criminal liability in their past is not *per se* reckless and the SEC has failed to estab-

lish, by a preponderance of the evidence, that Lowy was reckless in his association with these individuals.

Lowy took precautions to ensure that Falkowitz could not profit from this transaction if the business was not profitable. Tr. 1070. The Court finds that this was a reasonable preventative measure to take in entering into this transaction with an individual with past criminal liability. Further, Lowy insisted that Falkowitz cease his association with the business once he learned that Falkowitz had been indicted. Tr. 339, 598–99, 1096–97. Finally, Lowy did not rely upon Falkowitz' representations regarding the ownership and/or value of the Plantations, instead he relied upon independent appraisals and title opinions. The Court finds that Lowy's actions do not support a finding of recklessness.

As for Bruckman, Lowy testified that he did not know, at the time that Bruckman was retained, that he had a criminal record. Further, Lowy testified that he did not make the decision to retain Bruckman. Tr. 1194. Bruckman was not in a position to opine on the ownership or valuation of the Plantations and his criminal conviction had been in the past. Bruckman did not have any issues relating to criminal activity during his association with LARI. The Court finds that Lowy's willingness to work with Bruckman, after he was retained by others, was not reckless under the circumstances.

### Method of Valuing the Plantations

■ The stated value of the Brazilian Plantations was approximately $5 million, based on the liquidation value of the stock provided to Moura as consideration for the properties. Ex. 1, 2. The SEC asserts that this value is inaccurate and that using the liquidation value of the stock was a reckless method, employed by Lowy, resulting in the inaccurate representation. The Court rejects this assertion. Al-

though the predecessor's costs is the usual and best method of valuing assets if the consideration exchanged does not have a readily determinable value (Tr. 1429; 1367–68), the failure to use that method is not necessarily reckless. Again, the fact that Lowy may not have used the preferred method to value the properties does not amount to recklessness on his part. Using another valuation method, that is approved by an accounting firm, and which results in what appears to be a conservative estimate, cannot be said to constitute an extreme departure from the exercise of ordinary care.

Lowy himself wished to use Moura's costs as the basis for valuing the properties. Tr. 1061, 1367–68. In fact, Lowy made numerous requests to receive a statement of costs from Moura (Tr. 1061–62, 1109–18, 1323–24; Ex. DF) and drafted the original assignment agreement which required that Moura provide a statement of his costs. Tr. 1061–62; Ex. 78. The SEC presented no evidence to suggest that Lowy did not indeed intend to obtain Moura's costs and use them to establish the value of the properties. The fact that Moura failed to provide his costs was not within Lowy's control and the Court will not accept the proposition that Lowy's failure to abandon what he believed to be a lucrative business deal because of Moura's failure, particularly when faced with an alternative method of valuation, amounts to recklessness. The evidence presented at trial establishes that Lowy did not suggest the $5 million valuation (Tr. 94–95, 1124, 1314–15), that he did not make the decision to use the liquidation value of the stock as a basis for the valuation and that the accountants concurred in the decision to use the liquidation value. Tr. 740–41, 749–50. Further, Lowy, as well as LARI's management and the accountants, believed that the $5 million valuation was conserva-

tive because the properties were appraised twice at a much higher value. Tr. 94–95, 124–26, 413, 497, 1171, 1174–75, 1314–15. Accordingly, the Court finds that the evidence presented does not establish, by a preponderance of the evidence, that Lowy was reckless in stating the $5 million valuation.

The SEC presented the testimony of Robert Fish, a public accountant with Coopers, now Price Waterhouse Coopers. Tr. 1428–43. Mr. Fish testified that the method of valuation used by Lowy was unusual (Tr. 1429–30, 1442) and that the transactions in question "gave [him] some pause." Tr. 1433. Although the SEC points to Mr. Fish's testimony as evidence of Lowy's recklessness, the Court finds that the testimony, although credible, did little to establish any facts or provide any support for a finding of recklessness.

Initially, the Court notes that Mr. Fish's testimony regarding the unusual nature of the valuation method used, was uncontroverted, and in fact Lowy himself testified to the same facts. Tr. 1061, 1367–68. Further, although Mr. Fish testified that the transaction gave him pause, his testimony was that he was unfamiliar with the locale and this type of transaction and that he desired more information. Tr. 1433–34. Mr. Fish's testimony was that he simply did not remember whether he received any further information. He also did not remember discussing any method of valuation or whether he concurred with, or even recommended, that the valuation be based on the liquidation value of the stock. Tr. 1430–32, 1434, 1437–38. In fact, Mr. Fish's testimony does nothing to establish that Coopers did not concur with the decision to use the liquidation value method to value the Plantations and did nothing to establish that Lowy was reckless in pursuing the transaction or in using the liquidation value to value the Plantations.

In addition to the "red flags" discussed above, the SEC presented evidence of a variety of more minor issues which they contend are evidence of recklessness on Lowy's part. For instance, the SEC points to some inconsistencies in the deeds that Lowy received for the Plantations and asserts that his failure to recognize and react to the inconsistencies amounts to recklessness. Specifically, the SEC points to the fact that two of the deeds in question listed grantors other than Moura. Tr. 1282–83. However, the Court finds that any inconsistencies in the deeds were minor and that although they may stand out now, given the information that has been revealed regarding these Plantations and the transactions, it was not reckless of Lowy to have either failed to notice or to have ignored these minor inconsistencies. This is particularly true because Lowy is not a real estate law expert and because he intended, and ultimately did, seek out and receive a title opinion from a real estate lawyer. Ex. L.; Tr. 1182–83.

The Court finds that the evidence presented by the SEC falls short of establishing, by a preponderance of the evidence, that Lowy was reckless in making any statement regarding the ownership and/or value of the Brazilian Plantations. Much of the evidence presented by the SEC relates to "red flags" which, considered now with the benefit of hindsight, might have alerted a businessman to irregularities in this business transaction. However, the Court finds that the SEC has not established that Lowy was reckless in failing to recognize any of these "red flags" at the time they were presented to him. Accordingly, the SEC has failed to establish that Lowy acted with scienter, within the meaning of 10b–5.

As the SEC has failed to establish the element of scienter, no liability can attach under Count One.

B. Count II: Did Lowy violate Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 by making misleading representations in LARI's Form 10–SB?

The Second Count alleged by the SEC, also pursuant to Section 10(b) and Rule 10b–5, is substantially similar to Count One. The representations in question and the evidence of scienter are the same. As discussed above, the SEC has failed to establish that Lowy acted with scienter and as such, no liability can attach for Count Two.

C. Count III: Did Lowy violate Rule 13b2–1 by, directly or indirectly, falsifying or causing to be falsified, LARI's books, records or accounts by including assets that did not exist and/or were materially overvalued?

█ The gravamen of the Third Count alleged by the SEC is identical to the Two Counts previously discussed. The SEC alleges that Lowy violated Rule 13b2–1 by making misrepresentations regarding the ownership and valuation of the Brazilian Plantations in LARI's Information Statement and Registration Statement. Again, the Court reiterates that the evidence is decidedly unclear regarding the legal title to and value of the Brazilian Plantations and that it is nearly impossible to determine whether or not the SEC carried its burden of proof on those issues. However, it is again unnecessary for the Court to make the determination because the SEC has failed·to establish that Lowy acted unreasonably, a prerequisite to 13b2–1 liability. *See SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 865–866 (S.D.N.Y.1997).

Lowy argues that the SEC has not established that he, either directly or indirectly, made any of the alleged misstatements in LARI's books and records. The Court rejects this assertion. Although the evidence established that Lowy was neither a director nor an officer of LARI and that he did not control the books and records of LARI (Tr. 331, 1166–67), the statements in question here did not originate with LARI, but with the predecessor companies and with Lowy himself. Separating himself from LARI does not separate Lowy from the statements at issue in this case. Lowy was directly involved in allegedly acquiring the Plantations for the company and in obtaining the appraisals. Tr. 1054–55, 1057, 1060–63, 1064–65, 1101–03, 1138–40, 1149–50. Lowy maintained the corporate records of the predecessor companies (Tr. 327–29) and the statements in question originated at that time. The statements were simply transplanted to LARI's books once the merger took place. As such, the Court finds that Lowy is, at least indirectly, responsible for the alleged misstatements contained in LARI's books and records.

The SEC again fails in meeting its burden of proof on the requisite state of mind. Unlike an action brought pursuant to Rule 10b–5, the SEC is not required to prove scienter under Section 13. *See SEC v. McNulty*, 137 F.3d 732, 740 (2d Cir.1998) (holding that lack of scienter is not a defense to a Section 13 violation); *Softpoint*, 958 F.Supp. at 865–66. However, "standards of reasonableness" apply in determining whether or not a Section 13 violation occurred. *Softpoint*, 958 F.Supp. at 865–66. The SEC's evidence that Lowy acted unreasonably with respect to the statements made in LARI's books and records was the same evidence that was presented to prove that Lowy acted recklessly. Having previously discussed the SEC's allegations and Lowy's conduct, the Court finds that the SEC failed to prove, by a preponderance of the evidence, that Lowy acted unreasonably in stating the

ownership and/or valuation of the Brazilian Plantations. As such, the SEC has not established that Lowy is liable for a violation of Rule 13b2–1.

## CONCLUSION

Having found no basis for liability, it is unnecessary for the Court to address the propriety of the SEC's proposed remedies.

For the reasons set forth herein, the Court dismisses the claims and directs the Clerk of the Court to enter judgment in favor of the Defendant.

SO ORDERED.